UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID HOFFMAN,

        Plaintiff,

vs.

MAREX SERVICES INC., MAREX CAPITAL MARKETS INC., and MAREX GROUP, PLC,

        Defendants.

25 CV 05299

**COMPLAINT AND JURY DEMAND**

Plaintiff David Hoffman ("Plaintiff" or "Hoffman") files this Complaint against Defendants Marex Services Inc. ("Marex Services"), Marex Capital Markets Inc. ("Marex Capital"), and Marex Group plc ("Marex Group," and together with Marex Services and Marex Capital, the "Defendants") alleging as follows:

**THE MAREX DEFENDANTS AND THEIR ACQUISITION
OF THE E D & F MAN ENTITIES**

1. Upon information and belief, Defendant Marex Group is the parent entity that owns and controls Defendants Marex Services and Marex Capital.

2. In or about December 2022, Defendant Marex Group acquired E D & F Man Holdings, Inc. and all of its subsidiaries, including E D & F Man Services, Inc. ("Man Services") and E D & F Man Capital Markets, Inc. ("Man Capital").

3. Upon information and belief, concurrently with the acquisition, Man Services and Man Capital changed their names to Marex Services and Marex Capital.

4. Man Services, a Delaware corporation, changed its name to Marex Services Inc. (named as a defendant in this action) on December 1, 2022. This name change was filed with the Delaware Secretary of State and is attached hereto as **Exhibit A**.

5. Man Capital, a New York corporation, changed its name to Marex Capital Markets Inc. (also named as a defendant in this action) on December 5, 2022. That name change was filed with the New York Secretary of State and is attached hereto as **Exhibit B**.

## NATURE OF THIS ACTION

6. Plaintiff brings this action as a result of a breach of an employment agreement he entered into with Man Services (now Defendant Marex Services).

7. Under his employment agreement with Man Services, as subsequently amended, Plaintiff was entitled to receive ten percent (10%) of the gross proceeds of a sale (the "10% of Sale Proceeds") of an electronic trading software program which he and a colleague developed called OptionsLive.

8. Upon information and belief, the ownership rights in OptionsLive were held by Man Capital during Plaintiff's employment.

9. Man Services and Man Capital, along with OptionsLive and associated intellectual property rights therein, were sold for USD 233.6 million (two hundred thirty three million six hundred thousand dollars) to Defendant Marex Group.

10. Despite Plaintiff's employment agreement and the amendments thereto, all of which are binding on Man Services' successor in interest Marex Services, Defendant Marex Services refuses to pay Plaintiff the 10% of Sale Proceeds for OptionsLive that he is owed.

## PARTIES

11. Plaintiff is an individual residing at 15 Hillside Avenue, Short Hills, NJ 07076.

12. Upon information and belief, Defendant Marex Services is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 140 East 45th Street, 10th Floor, New York, NY 10017. Defendant Marex Services is registered to do business in the State of New York.

13. Upon information and belief, Defendant Marex Capital is a corporation duly organized under the laws of the State of New York with its principal place of business at 140 East 45th Street, 10th Floor, New York, NY 10017

14. Upon information and belief Defendant Marex Group is a public limited company duly organized under the laws of the United Kingdom with a registered office and headquarters at 155 Bishopsgate, London, United Kingdom, EC2M 3TQ.

## JURISDICTION AND VENUE

15. Jurisdiction is vested in this Court, pursuant to 28 U.S.C § 1332, because the parties are diverse and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

16. Venue is properly laid in this Court, pursuant to 28 U.S.C. § 1391(c)(3), because a substantial portion of the events set forth herein occurred in this District. Defendant Marex Services is located in this District and Plaintiff performed a substantial portion of his employment agreement in this District. Moreover, Defendant Marex Services breached the aforementioned agreement in this District.

17. This Court has both general and specific personal jurisdiction over Defendant Marex Services because it has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. Additionally, the employment

agreement between Man Services and Plaintiff sets forth that all disputes arising thereunder are to be litigated in New York and that agreement is binding on Marex Services.

18. This Court has general personal jurisdiction over Defendant Marex Capital because it is domiciled and does business in this District.

19. This Court also has specific personal jurisdiction over Defendant Marex Group because Marex Services acted as an agent and/or alter ego of Marex Group with respect to the actions that give rise to this case, which occurred in this District. Marex Group directed Marex Services to withhold the compensation which Marex Services owed Plaintiff. Upon the acquisition of Man Services by Marex Services, Plaintiff reported to an individual who was employed as an executive of Defendant Marex Group. Upon information and belief, Marex Services, during the relevant time period, had no organizational structure allowing it to make any decisions, including the decision to pay (or withhold from) Plaintiff the compensation that he is owed under the employment agreement, as amended, without the approval of Marex Group. Accordingly, in acting at Marex Group's direction and under its control in withholding Plaintiff the compensation he was owed, Marex Services was merely the alter ego or agent of Marex Group.

## FACTUAL BACKGROUND

### Defendant Marex Services' Recruitment and Hiring of Plaintiff

20. Plaintiff has spent his career in trading commodities and securities for major banking and commodities trading companies.

21. In January 2019, Plaintiff was working as a Managing Director at Nomura Securities ("Nomura"), in New York, where he was a trader of securities and other financial

instruments and manager of a group of traders, when he met Brian Mulcahy ("Mulcahy"), the Chief Business Officer of Man Capital.

22. Mulchay oversaw the building of innovative software that would allow large banks to trade interest rate swaps with each other electronically, without an intermediary. (An interest rate swap is an agreement between two parties to exchange one stream of interest payments for another, over a set period of time.) Man Capital had recently parted ways with the previous head of the business and was interested in hiring Plaintiff for that position.

23. Thereafter, on February 12, 2019, Plaintiff entered into an employment agreement (the "Employment Agreement") with Man Services. Pursuant to that Employment Agreement, Plaintiff was given the title of Senior Vice President, Head of Interest Rate Derivatives, and was to report directly to Peter McCarthy, then-Chief Executive Officer of Man Capital ("McCarthy"). The Employment Agreement is attached hereto as **Exhibit C.**

24. The Employment Agreement expressly contemplated that "Employee [Plaintiff] may in the course of his employment…create, author or originate (either alone or jointly with others) Inventions and [copyrightable] Works." Ex. C, ¶ 10(b). The Employment Agreement further provided that to the extent the intellectual property rights ("IPRs") in these inventions and works did not automatically vest in Man Services, they would be assigned to it. *Id.* Ultimately, on information and belief, Man Capital acted as owner of OptionsLive, as noted above, licensing it to customers.

25. In addition to providing Plaintiff with a salary, the Employment Agreement provided him with ten percent (10%) of the net pretax profits of the new Interest Rate Derivative business (as well as five percent (5%) of other businesses to which he was assigned).

**The Development of the OptionsLive Electronic Trading Platform**

26.     In May 2019, three months after the Employment Agreement was dated, Mulchay and McCarthy agreed to Plaintiff's proposal to hire Jason Margiotta ("Margiotta"), previously with Nomura, so that Plaintiff and Margiotta might develop a new software product that they subsequently named "OptionsLive."

27.     While working at Nomura, Plaintiff and Margiotta realized there was a demand for software, accessible to users via the cloud, that traders of securities and other financial instruments could use to more efficiently trade options on the Chicago Mercantile Exchange ("CME"). (Options are financial instruments known as derivatives that give the buyer the right to buy or sell the underlying asset at a stated price within a specified period.)

28.     Typically, when trading options, traders are required to deploy several software programs simultaneously, including trading software, options valuation software, and trading algorithms to direct the multi-step process involved in executing and settling a trade. OptionsLive allowed traders to do all of these things using a single software program.

29.     Plaintiff and Margiotta had OptionsLive vetted and approved by CME. Once approved by CME, OptionsLive would be unique because competing systems would not have access to CME's secure database of current and historical prices. The proposed software product would accomplish and optimize all the tasks needed to execute and settle an options trade with access to this CME database, thus setting it apart in the marketplace.  Others seeking to introduce competing programs would not have access to CME's pricing database, thus creating a competitive advantage for OptionsLive and a barrier to entry for competing software as a service.

30. The name "OptionsLive" conveyed the idea that traders could deploy the software at the moment they were ready to trade, thereby conveying the concept of "Going Live.". ("Going Live" is vernacular used among traders that means "ready to trade."). Traders would pay a monthly subscription fee to use OptionsLive, which was offered as "software as a service" (also known as "SaaS"). It was likely that once traders used OptionsLive they would continue to do so because the risks of trying another product would be too great, with large financial stakes if the new product did not prove as reliable or trustworthy as OptionsLive.

### The Near Immediate Success of OptionsLive

31. Upon information and belief, Man Capital (now Defendant Marex Capital) owned and controlled OptionsLive. *See RVassets Ltd. v. Marex Capital Markets Inc. et al,* Case No. 1:23-cv-14192, Doc. No. 25 at p. 4 (N.D. Ill.) (explaining Marex Capital's launch of OptionsLive), which is attached hereto as **Exhibit D**.

32. OptionsLive was launched in May 2020 for internal use in New York, New York, Chicago, Illinois and London, England.

33. In September 2020, when OptionsLive was publicly launched, COEX, a futures broker division of Tullett Prebon in New York, became the first OptionsLive customer. Tullett Prebon is one of the world's largest interdealer brokers.

### Amendment of the Employment Agreement in View of OptionsLive's Success

34. On October 6, 2020, Plaintiff's Employment Agreement was first amended (the "First Amendment") to change certain terms relating to compensation Plaintiff was entitled to earn under the Employment Agreement. The First Amendment was prepared and signed on Man Capital (now Defendant Marex Capital) letterhead.

7

35. On April 14, 2021, Plaintiff's Employment Agreement was further amended (the "Second Amendment," appended hereto as **Exhibit E**) to reflect the invention of OptionsLive and to memorialize that Hoffman has the right to ten percent (10%) of the gross sale proceeds of OptionsLive if the program were to be sold. Ex. E ¶ 2. The Second Amendment was on Man Services (now defendant Marex Services) letterhead. The Employment Agreement and First and Second Amendments were signed by the same individual, Phil Lyons, acting as Senior HR (Human Resources) Business Partner.

36. Specifically, the Second Amendment provided:

> To the extent OptionsLive and its IPRs [intellectual property rights] are sold by the company or any of its affiliates to a third-party, you [Hoffman] shall be entitled to ten percent (10%) of the gross proceeds from such sale (the "10% of Sale Proceeds").

Ex. E, ¶ 2. The Second Amendment was intended to make up for the earnings Plaintiff lost from participating in a share of income from OptionsLive once that software program was sold.

## Sale of OptionsLive

37. In the spring of 2021, McCarthy announced his intent to retire from day-to-day operations and a new CEO was named, Joseph Weinhoffer ("Weinhoffer"). Weinhoffer asked Plaintiff to find an outside party to invest in OptionsLive and make it a stand-alone company or to entertain offers to buy OptionsLive. Throughout the summer of 2021, Plaintiff took meetings with several venture capital firms introduced by Weinhoffer and met with the venture arm of CME on multiple occasions.

38. None of these meetings yielded an investment in or sale of OptionsLive.

8

39. On June 15, 2022, Plaintiff and Man Services mutually agreed to terminate Plaintiff's employment and memorialized that termination in a letter dated June 20, 2022 (the "Termination Letter"). The Termination Letter, a redacted version attached hereto as **Exhibit F**, was sent on Man Capital (now Defendant Marex Capital) letterhead.

40. In the Termination Letter, Man Capital (now Defendant Marex Capital) ratified Man Services' (now Defendant Marex Services') agreement via the Second Amendment to pay Plaintiff the 10% of Sale Proceeds if "OptionsLive and its IPRs [intellectual property rights] are sold by the Company [Man Services] or any of its affiliates as of the date hereof to a third-party" and "agreed that the 10% of Sale Proceeds shall remain in full force and effect subsequent to" the agreed upon date of termination of Plaintiff's employment, namely, June 15, 2022. Ex. F, penultimate paragraph at p. 2.

41. Immediately following termination of his employment, Plaintiff provided consulting services to Man Services (now Defendant Marex Services).

42. On information and belief, later in 2022, E D & F Man Holdings, Inc. and all its subsidiaries, including Man Services and Man Capital, as well as OptionsLive and all intellectual property rights therein, were sold to a UK entity, Marex Group plc (named as a defendant in this action). As noted *supra* in paragraphs 3 to 5, Man Services changed its name to Marex Services and Man Capital changed its name to Marex Capital.

### Defendants' Failure to Pay Plaintiff

43. On June 13, 2023, Defendant Marex Services terminated Plaintiff's role as consultant.

44. On June 20, 2023, Plaintiff wrote to Marex Services to acknowledge termination of his consulting services and to demand payment of the "ten percent (10%) of the gross sale proceeds" from the sale of OptionsLive to Marex Group.

45. Plaintiff never received payment from Defendants, despite his demands for same.

## Defendants' Ongoing Profit from OptionsLive

46. Upon information and belief, OptionsLive is a key asset of Defendants and generates significant revenue for Defendants.

47. In the amendment to the most recent Form F-1 Registration Statement dated April 15, 2024 that Marex Group filed with the United States Securities and Exchange Commission, Marex Group reported material benefits to the business resulting from its acquisition of Man Capital (now Defendant Marex Capital). Relevant excerpts of Marex Group's Amended Form F-1 Registration Statement dated April 15, 2024 are attached hereto as **Exhibit G**.

48. Marex Group's acquisition of Man Capital (now Defendant Marex Capital) substantially expanded Defendants' geographic exposure in North America and increased the size of Defendants' client base. Marex Group reported that its client base grew by 83% from $8.0 billion as of June 30, 2022 to $14.6 billion as of December 31, 2022, "**primarily as a result of the acquisition of [Man Capital]**" (emphasis added). *See* Ex. G.

49. Marex Group's "revenue increased by 75.0% to $1,244.6 million for the year ended December 31, 2023 from $711.1 million for the year ended December 31, 2022." *Id*. In the United States, Marex Group's revenue increased from $238.1 million in 2022 to $422 million in 2023. *Id*.

50. Moreover, Marex Group's net commission income dramatically increased across its business, "reflecting the [Man Capital] acquisition" as well as another acquisition. Moreover,

Marex reported a year over year sixty-three percent increase (from $144.7 million in 2022 to $236.2 million in 2023) in net commissions from its clearing business "as a result of the larger client base from the [Man Capital] acquisition." *Id.*

51. Marex Group "obtain[ed] an acquisition price [for Man Capital] that was at a material discount to the tangible net asset value of the acquired business." *Id*. "[T]hrough the acquisition of [Man Capital], which was completed at 0.8 times discount to book value, [Marex Group] increased [its] geographic exposure to the U.S. and APAC markets and added over 1,000 new clients." *Id*.

## FIRST CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Marex Services)

52. Plaintiff repeats and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

53. In June 2022, via the Termination Letter, Man Services (now Defendant Marex Services), through Man Capital (now Defendant Marex Capital), reaffirmed Hoffman's entitlement to the 10% of Sale Proceeds from OptionsLive.

54. Hoffman's Employment Agreement states that it "shall be binding upon and inure to the benefit of the Parties hereto, their heirs, personal representatives, successors and assigns." Ex. C, ¶ 18. The Second Amendment states that "[e]xcept as specifically amended herein," the Employment Agreement "shall remain in full force and effect" and that "the parties agree to be bound by the terms and conditions of the Employment Agreement, as amended," which amendment included the agreement to pay Hoffman the 10% of Sale Proceeds of OptionsLive and its IPRs. Ex. E, ¶ 7.

55. Defendant Marex Services is the successor and assign of Man Services. As such, it is bound to the Employment Agreement and all amendments thereto, including the Second Amendment.

56. Hoffman fully performed all his obligations under the Employment Agreement, including, without limitation, by developing OptionsLive.

57. On June 20, 2023, Hoffman wrote to Defendant Marex Services demanding ten percent (10%) of the gross proceeds from the sale of OptionsLive, as required by the Employment Agreement and all amendments thereto, including the Second Amendment.

58. Defendant ignored Hoffman's demand for payment of the 10% of Sale Proceeds.

59. Defendant has breached its obligation under the Agreement and Second Amendment by failing to pay Hoffman ten percent (10%) of the gross proceeds from the sale of OptionsLive.

60. Hoffman has thus been damaged by Defendant's actions in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

61. Plaintiff repeats and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

62. By reason of the foregoing, in the alternative, if the services that Marex Services acquired (namely the development of OptionsLive), were not services provided by Hoffman pursuant to the terms of the Employment Agreement and all amendments thereto, including the Second Amendment, then Plaintiff has conferred benefits on the Defendants in the form of software development services culminating in the existence of OptionsLive.

63. Defendants have benefited from OptionsLive, thereby enriching themselves at Plaintiff's expense.

64. Defendants have been unjustly enriched by accepting the benefits conferred on it by the Plaintiff, but by refusing to pay Plaintiff the compensation to which he is entitled. Equity and good conscience militate against allowing Defendants to keep OptionsLive for themselves and to not pay Plaintiff the full compensation to which he is entitled.

65. Accordingly, Plaintiff should be awarded restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. Damages in an amount to be proven at trial; and

B. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by a jury on all issues so triable.

Dated: July 12, 2024

**NORRIS MCLAUGHLIN, P.A.**

By: /s/ Edward G. Sponzilli
    Edward G. Sponzilli
    Jeanne M. Hamburg
    Benjamin D. Schwartz
7 Times Square, 21st Floor
New York, NY 10036
Tel: 212-808-0700
Fax: 212-808-0844
egsponzilli@norris-law.com.
jhamburg@norris-law.com
bschwartz@norris-law.com

*Attorneys For Plaintiff David Hoffman*