# EXHIBIT A

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:00 PM 12/01/2022
FILED 12:00 PM 12/01/2022
SR 20224146678 - File Number 4112141

CERTIFICATE OF AMENDMENT

OF THE

CERTIFICATE OF INCORPORATION

OF

E D & F MAN SERVICES INC.

E D & F Man Services Inc. (the "Corporation"), a corporation organized and existing under and by virtue of the provisions of the Delaware General Corporation Law, hereby certifies on this 1st day of December, 2022 that:

1.    The sole stockholder and the board of directors of the Corporation, by joint action, duly adopted the following resolution in accordance with the provisions of Section 141, Section 228 and Section 242 of the Delaware General Corporation Law:

> **RESOLVED** that the sole stockholder and board of directors hereby declare it advisable and in the best interests of the Corporation that Article One of the Certificate of Incorporation of the Corporation be amended to read as follows:
>
> > "1.    The name of the corporation is Marex Services Inc. (hereinafter referred to as the "Corporation")."

2.    This amendment to the Certificate of Incorporation of the Corporation has been duly adopted by the sole stockholder and a majority of the directors of the Corporation in accordance with the provisions of Section 242 of the Delaware General Corporation Law.

**IN WITNESS WHEREOF**, this Certificate of Amendment of the Certificate of Incorporation has been executed by Thomas A. Hayes Jr., the Secretary of the Corporation, as of the date first written above.

E D & F MAN SERVICES INC.

By:    _____
Thomas A. Hayes Jr.
Secretary

# EXHIBIT B

CT07

**CERTIFICATE OF AMENDMENT**
**OF THE**
**CERTIFICATE OF INCORPORATION**
**OF**
**E D & F MAN CAPITAL MARKETS INC.**

Under Section 805 of the Business Corporation Law

The undersigned, being the Secretary of E D & F Man Capital Markets Inc. (the "Corporation"), hereby certifies:

1.   The name of the Corporation is E D & F Man Capital Markets Inc. The name under which the Corporation was formed was Holland-Colombo Trading Society, Incorporated.

2.   The Certificate of Incorporation of the Corporation was filed by the Department of State on January 10, 1952.

3.   That the amendments to the Certificate of Incorporation of the Corporation are as follows:

   (a)   Article First of the Certificate of Incorporation, relating to the name of the Corporation, is hereby amended to read in its entirety as follows:

   "FIRST: The name of the corporation is MAREX CAPITAL MARKETS INC."

   (b)   Article Fifth of the Certificate of Incorporation, relating to the office of the Corporation and the address at which process may be served, is hereby amended to read in its entirety as follows:

   "FIFTH: The county in which the office of the corporation is to be located in the State of New York is New York. The Secretary of State of the State of New York is hereby designated as the agent of the corporation upon whom process against it may be served. The post office address to which the Secretary of State shall mail a copy of any process against the corporation served upon him is:

   Marex Capital Markets Inc.
   140 East 45th Street, 10th Floor
   New York, New York 10017
   Attention: General Counsel"

---

Filed with the NYS Department of State on 12/05/2022
Filing Number: 221205000382 DOS ID: 83185

4.   This Certificate of Amendment of the Certificate of Incorporation was authorized by joint action by written consent of the Corporation's sole Shareholder and the entire Board of Directors dated December 1, 2022.

**IN WITNESS WHEREOF**, this certificate has been signed this 1ˢᵗ day of December, 2022.

_____
Thomas A. Hayes Jr.
Secretary

Filed with the NYS Department of State on 12/05/2022
Filing Number: 221205000382 DOS ID: 83185

CT07

# CERTIFICATE OF AMENDMENT
## OF THE
## CERTIFICATE OF INCORPORATION
### OF
### E D & F Man Capital Markets Inc.

*(Insert Current Name of Domestic Corporation)*

Under Section 805 of the Business Corporation Law

Filer's Name and Mailing Address:

Thomas A. Hayes Jr., General Counsel

*Name:*

E D & F Man Capital Markets Inc.

*Company, if Applicable:*

140 East 45th Street, 10th Floor

*Mailing Address:*

New York, New York 10017

*City, State and Zip Code:*

**NOTES:**

1. The name of the corporation and its date of incorporation provided on this certificate must exactly match the records of the Department of State. This information should be verified on the Department of State's website at www.dos.ny.gov.
2. This form was prepared by the New York State Department of State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores.
3. The Department of State recommends that all documents be prepared under the guidance of an attorney.
4. The certificate must be submitted with a **$60** filing fee.

*For Office Use Only*

DRAWDOWN

CST REF:          14657331LP

Filed with the NYS Department of State on 12/05/2022
Filing Number: 221205000382 DOS ID: 83185



**Division of Corporations,
State Records and
Uniform Commercial Code**

New York State
**Department of State**
**DIVISION OF CORPORATIONS,**
**STATE RECORDS AND**
**UNIFORM COMMERCIAL CODE**
One Commerce Plaza
99 Washington Ave.
Albany, NY 12231-0001
https://dos.ny.gov

## CERTIFICATE OF CHANGE
### OF

MAREX CAPITAL MARKETS INC.

*(Insert Name of Domestic Corporation)*

Under Section 805-A of the Business Corporation Law

FIRST: The name of the corporation is:

MAREX CAPITAL MARKETS INC.                                    .

If the name of the corporation has been changed, the name under which it was formed is:

HOLLAND-COLOMBO TRADING SOCIETY, INCORPORATED                .

SECOND: The certificate of incorporation was filed by the Department of State on:

01/10/1952                                    .

THIRD: The change(s) effected hereby are: *(Check appropriate statement(s))*

☐ The county location, within this state, in which the office of the corporation is

located, is changed to:                                    .

☑ The post office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery is changed to read in its entirety as follows:

c/o United Agent Group Inc. 600 Mamaroneck Avenue #400 Harrison, NY 10528

☑ The email address to which the Secretary of State shall email a notice of the fact that process against the corporation has been served electronically upon the Secretary of State is:

govdocs@unitedagentgroup.com

☑ The email address to which the Secretary of State shall email a notice of the fact that process against the corporation has been served electronically upon the Secretary of State is changed to read as follows:

govdocs@unitedagentgroup.com                                    .

☑ The email address to which the Secretary of State shall email a notice of the fact that process against the corporation has been served electronically upon the Secretary of State is deleted.

☑ The corporation hereby designates

United Agent Group Inc.

its registered agent upon whom process against the corporation may be served.
The street address of the registered agent is:

600 Mamaroneck Avenue #400 Harrison, NY 10528                .

Filed with the NYS Department of State on 02/06/2023
Filing Number: 230207001395 DOS ID: 83185

☐ The corporation hereby changes the designation of its registered agent to:

_____ .

The street address of the registered agent is:

_____ .

☐ The corporation hereby changes the address of its registered agent to:

_____ .

☐ The corporation hereby revokes the designation of its registered agent.

FOURTH: The change was authorized by the board of directors.

X ___*Ashley Perkins*___
 *(Signature)*

**Ashley Perkins**
 *(Name of Signer)*

**Special Secretary**
 *(Title of Signer)*

## CERTIFICATE OF CHANGE

OF

MAREX CAPITAL MARKETS INC.

*(Insert Name of Domestic Corporation)*

Under Section 805-A of the Business Corporation Law

Filer's Name and Mailing Address:

Ashley Perkins
*Name*

United Agent Group
*Company, if Applicable*

801 US Highway 1
*Mailing Address*

North Palm Beach, FL 33408
*City, State and Zip Code*

**NOTES:**
1. The name of the corporation and its date of incorporation provided on this certificate must exactly match the records of the Department of State. This information should be verified on the Department of State's website at https://dos.ny.gov.
2. This form was prepared by the New York State Department of State. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores.
3. The Department of State recommends that all documents be prepared under the guidance of an attorney.
4. The certificate must be submitted with a **$30** filing fee.

*For Office Use Only*

Filed with the NYS Department of State on 02/06/2023
Filing Number: 230207001395 DOS ID: 83185

# EXHIBIT C

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement"), dated as of February 12, 2019 ("Effective Date") is entered into by and between E D & F Man Services Inc., having its corporate office at 140 East 45th Street, 10th Floor, New York, New York 10017 (the "Company"), and David Hoffman 15 Hillside Ave, Short Hills, NJ 07078 (the "Employee") (each a "Party" and together the "Parties").

In consideration of the promises, terms and conditions set forth in this Agreement, the sufficiency of which consideration the Parties expressly acknowledge, the Parties, intending to be legally bound, hereby agree as follows:

**1.     Representations and Warranties.**    Employee represents and warrants to Company that Employee is not bound by any restrictive covenants or other obligations or commitments of any kind that would in any way prevent, restrict, hinder or interfere with Employee's acceptance of employment under the terms and conditions set forth herein or the performance of all duties and services hereunder to the fullest extent of Employee's ability and knowledge.  Employee understands and acknowledges that he is not expected or permitted to use or disclose confidential information belonging to any prior employer in the course of performing his duties for Company.

**2.     Term of Employment.**    Company will employ Employee and Employee accepts employment by Company commencing on or about March 1, 2019 (the "Commencement Date") on the terms and conditions set forth in this Agreement until such employment is terminated in accordance with Section 5 herein (the "Employment Period"). This Agreement and Employee's employment hereunder is contingent upon the satisfactory completion of a background check (education, criminal, credit and employment), drug screening, reference checks and timely presentation of employment eligibility verification documents and completion of Form I-9 in conformity with the Immigration Reform and Control Act of 1986, which shall all be completed prior to the Commencement Date.

**3.     Duties and Functions.**

(a)     Employee shall be employed as a Senior Vice President, Head of Interest Rate Derivatives in Company's Capital Markets and Brokerage Businesses in the United States (the "Business").  Employee's place of work shall be at Company's New York, NY office.

(b)     Employee shall report to Peter McCarthy, Chief Executive Officer or his successor ("Employee Supervisor").

(c)     Employee agrees to undertake the duties and responsibilities inherent in the position of Senior Vice President, Head of Interest Rate Derivatives, which may encompass different or additional duties as may, from time to time, be assigned and altered or modified by the Employee Supervisor or the Board of Directors of Company (the "Board"), but that are consistent with such position.

(d)     During the Employment Period, Employee agrees to obey all lawful and reasonable directions given to him by or under the authority of the Board consistent with his position.

(e)     During the Employment Period, Employee shall devote substantially all of his business time and efforts to the Business and will not, without the consent of Company, engage in consulting work or any trade or business for his own account or for or on behalf of any other person, firm or corporation that competes, conflicts or interferes in any material respect with the performance of his duties hereunder in any way.

(f)     It shall not be a violation of this Agreement for Employee to (i) serve on civic or charitable boards or committees, deliver lectures, fulfill speaking engagements or teach at educational institutions; (ii) serve on boards or committees of industry-related entities in seeking to promote the interests of the Business, with the Board's prior consent (which consent shall not be unreasonably withheld or delayed); (iii) serve on boards or committees of for-profit entities, with the Supervisor's prior consent (which consent shall not be unreasonably withheld or delayed); or (iv) engage in personal investment activities, so long as, in each case, such activities do not interfere in any material respect with the performance of Employee's duties hereunder.

4.     **Compensation.**

(a)     Salary.     During the Employment Period, Company agrees to pay Employee a salary at an annualized rate of Three Hundred Thousand United States Dollars (US$300,000) (the "Salary"), payable in accordance with Company's normal payroll schedule. Company may withhold from any amounts payable under this Agreement such federal, state or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(b)     Other Compensation. Employee shall be entitled to receive a Quarterly Payment according to the calculation set out at Schedule 1, less all taxes, standard employee contribution deductions and any deductions required by law, payable forty-five (45) days in arrears ("Quarterly Payment"). In order to be eligible for a Quarterly Payment, Employee must have not been terminated for Cause or resigned without Good Reason prior to the last day of the quarter to which such Quarterly Payment relates. Employee is not guaranteed a Quarterly Payment in any given quarter or for any specific amount.

(c)     Employee Benefits. Employee will be entitled to participate in all Company employee benefit plans on the same basis as other similarly situated management-level employees participating in such plans, subject to the terms of such plans, and subject to Company's right to amend, terminate or take other similar action with respect to such plans.

(d)     Vacation and Holidays. Employee will be eligible for thirteen (13) days of annual vacation benefits ("PTO"). In addition, Company provides ten (10) paid holidays. Any accrued but unused PTO may only be carried over in accordance with Company policy.

(e)     Business Expenses. In addition to the compensation provided for above, Company agrees to pay or to reimburse Employee for all reasonable, ordinary and necessary, properly documented, business expenses incurred in the performance of Employee's services hereunder in accordance with Company policy in effect from time to time, which policy (and any amendments) shall be provided in writing and in advance to Employee; provided, however, that the amount available to Employee for such travel, entertainment and other expenses may require advance approval by the Board in excess of certain limits. Employee shall submit vouchers and receipts for all expenses for which reimbursement is sought and Company shall reimburse Employee for all such expenses within ninety (90) days following Employee's

proper submission of the vouchers and receipts. Any rejection of reimbursement of expenses (and any explanation thereof) shall be provided to Employee in writing within seventy-five (75) days following Employee's submission of vouchers and receipts with respect to any such expense.

**5.    Employment Period: Termination.**

(a)    Employment Period.  This Agreement does not constitute an agreement to employ Employee for a specified period of time and Employee acknowledges and agrees that Employee shall be employed as an "at will" employee.  The Employment Period shall commence on the Commencement Date and shall continue until terminated by either Party providing the other Party with thirty (30) days' prior written notice (the "Termination Notice Period").  Employee acknowledges and agrees that the obligations imposed on Employee with respect to non-competition, confidentiality, non-disclosure and assignment of rights to inventions or developments in this Agreement shall continue, notwithstanding the termination of the employment relationship between the Parties.

(b)    Termination By Company For Cause.  Notwithstanding anything to the contrary contained in this Agreement, at any time during the Employment Period, Company may terminate Employee's employment for Cause (as defined below).  If Employee's employment is terminated for Cause, Employee will not be entitled to and shall not receive any compensation or benefits of any type following the Termination Date (as defined below), other than payment of Salary through the last day of employment, payment for any accrued but unused vacation, reimbursement of accrued reasonable business expenses and any right to continued benefits required by law or pursuant to the terms of any agreement, plan, policy or arrangement with Company or any of its affiliates (together, the "Accrued Obligations").

(i)    "*Cause*" shall be defined as:  (A) Employee's material dishonesty (including but not limited to any acts of embezzlement or misappropriation of funds, regardless of whether the embezzlement or misappropriation involves funds or assets of Company or a third party), fraud, serious dereliction of fiduciary obligation, conviction of a felony, plea of guilty or *nolo contendere* to a felony charge or any criminal act involving moral turpitude, or participation in criminal activity which, if prosecuted, would qualify as a felony or crime involving moral turpitude; (B) Employee's willful unauthorized disclosure of confidential information belonging to Company, or entrusted to Company by a client, customer, or other third party; (C) Employee's failure to meet or comply with the regulations set by any regulatory bodies, which render Employee unable to perform his duties under this Agreement, or Employee becoming disqualified under any applicable law or regulation from continuing to perform his job duties under this Agreement; (D) Employee's material violation of any material Company rule, regulation or policy made available in advance and in writing to Employee; (E) Employee's act materially adverse to the interests of Company or reasonably likely to result in material harm to Company or to bring Company into disrepute; (F) Employee's material breach of any obligation under this Agreement; or (G) Employee's repeated failure in any material respect to perform Employee's material duties.  Company may not terminate Employee for "Cause" unless (x) Company provides written notice to Employee setting forth in reasonable detail the specific conduct of Employee purporting to constitute Cause within ninety (90) days of the date the Employee Supervisor or the Board first becomes aware of its existence (the "Cause Notice Period"), (y) Employee fails to cure such conduct (if curable) within thirty (30) days following the date of receipt of such notice and (z) Company has terminated Employee's employment within ninety (90) days following such failure to cure.

3

(ii)      Company reserves the right to suspend Employee, with or without pay, for a reasonable period while it investigates any alleged grounds for Cause. If no grounds for Cause is found after Company's investigation, Company shall pay Employee payment of Salary, Quarterly Payments and benefits which were suspended and would have been paid to Employee but for the investigation. If grounds for Cause is found after Company's investigation, Employee shall not be entitled to payment of Salary, Quarterly Payments and benefits which were suspended, and Employee's employment shall be terminated in accordance with Section 5(b) hereunder.

(c)      Termination by Employee without Good Reason. Notwithstanding anything to the contrary herein, if Employee's employment is terminated by Employee without Good Reason, to the extent Company does not release Employee from the Non-Competition Obligations during the Non-Competition Period, each as defined in Section 8(b)(i), Company shall continue to pay Employee's Salary and Quarterly Payments through the Termination Notice Period. To the extent Company releases Employee from the Non-Competition Obligations during the full Non-Competition Period following a termination of Employee's employment by Employee without Good Reason, Employee will be entitled to the Accrued Obligations through the Termination Date.

(i)      "*Good Reason*" shall be defined as, without Employee's prior written consent: (A) any material diminution in Employee's title, duties, responsibilities or authorities, (B) any relocation of Employee's principal place of employment, to a location that is more than 25 miles from Company's New York, NY office on the Commencement Date or (C) any material breach by Company or any of its affiliates of this Agreement or of any other material agreement, plan, policy or arrangement with Employee. Employee may not resign his employment for Good Reason unless (x) Employee provides written notice to Company setting forth in reasonable detail the specific conduct of Company purporting to constitute Good Reason within ninety (90) days of the date Employee first becomes aware of its existence, (y) Company fails to cure such conduct (if curable) within thirty (30) days following the date of receipt of such notice and (z) Employee terminates his employment within ninety (90) days following such failure to cure.

(d)      Termination by Company without Cause or by Employee for Good Reason. Notwithstanding anything to the contrary contained in this Agreement, if Employee's employment is terminated by Company without Cause or by Employee for Good Reason, Company shall continue to pay Employee's Salary and Quarterly Payments through the date of termination of employment.

(e)      Termination for Employee's Permanent Disability. Notwithstanding anything herein to the contrary, to the extent permissible under applicable law, in the event Employee becomes permanently disabled during employment with Company, Company may terminate this Agreement by giving thirty (30) days' notice to Employee of its intent to terminate, and unless Employee resumes performance of the duties within five (5) days of the date of the notice and continues performance for the remainder of the notice period, this Agreement shall terminate at the end of the thirty (30) day period. For purposes of this Agreement, "permanently disabled" shall mean if Employee is considered totally disabled under any group disability plan maintained by Company and in effect at that time, or in the absence of any such plan, under applicable Social Security regulations, to the extent not inconsistent with applicable law. In the event of any dispute under this section, Employee shall submit to a physical examination by a licensed physician mutually satisfactory to Company

4

and Employee, the cost of such examination to be paid by Company, and the determination of such physician shall be determinative.

(f)     Termination Due To Employee's Death. This Agreement will terminate immediately upon Employee's death. In the event of death, Accrued Obligations shall be paid to the Employee's estate.

**6.     Compliance.** Employee agrees to abide by the laws, regulations, rules and directives of the U.S. Securities and Exchange Commission and the Financial Industry Regulatory Association ("FINRA"), as may be applicable to Employee's employment, and the rules, regulations, instructions, personnel practices, and policies of the Business, Company and any Group Company (defined as any company which is from time to time any parent holding company of the Business or Company, any subsidiary of the Business or Company, and any intermediate entity in the chain of entities that includes the Business or Company (whether or not below or above the Business or Company), and any changes thereof which may be adopted at any time, including but not limited to the following:

(a)     Registrations. Employee is required to achieve or maintain appropriate registration and memberships of FINRA, FSA, etc. to enable Employee to fulfill the responsibilities of Employee's position. Failure to do so may result in Employee's employment being terminated.

(b)     Bribery and Corruption. During the Employment Period, Employee: (i) shall not directly or indirectly procure, accept or obtain for his own benefit (or for the benefit of any other person) Gratuities (as defined below) from any third party in respect of any business transacted (whether or not by Employee) by or on behalf of the Business, Company or any Group Company; (ii) shall observe the terms of any policy issued by the Business, Company or any Group Company in relation to Gratuities; and (iii) shall, as soon as reasonably practicable, disclose or account to the Business, Company or any Group Company for any Gratuities received by Employee (or any other person on Employee's behalf or at his instruction). For purposes of this subsection 6(a), "Gratuities" shall mean the direct or indirect procurement to accept or obtain for Employee's own benefit (or for the benefit of any other person) any payment, rebate, discount, commission, vouchers, gift, entertainment or other benefit outside the normal course of business. Nothing in this subsection (a) shall prevent Employee from giving or participating in entertainment or business practices which are customary in the business in which the Business, Company or any Group Company is involved from time to time.

(c)     Insider Dealing. Employee shall, during the Employment Period and for 12 months after the termination of employment for any reason, comply (and procure that Employee's spouse, civil partner, long term partner, members of his household and dependent children shall comply) with all applicable federal and state laws, and all rules, regulations and policies of the Security Exchange Commission and all other applicable regulations, and any code of conduct of Company for the time being in force, in relation to dealings in shares, debentures or other securities of Company or any Group Company and any unpublished price sensitive or other inside information affecting the securities of any other company.

(d)     Compliance with Policy Statements.     Employee shall, during the Employment Period, maintain the highest reasonable level of professional, ethical and control standards in the business affairs. Employee shall be required to comply with the terms and

conditions of the Statements of Policy of Company and any Group Company, including but not limited to policies concerning Corporate Social Responsibility, Trading Mandates, Minimum Corporate Requirements, Bribery and Corruption, as such policies may be amended from time to time. *[Note to Draft: Please provide all policies referenced.]*

(e)     Anti-Money Laundering Procedures. Employee must comply with all anti-money laundering laws and regulations and the anti-money laundering procedures put in place by the Business, Company and any Group Company, as such policies may be amended from time to time. Training courses will be arranged by Company from time to time, which Employee will be required to attend.

7.     **Company Property.** All correspondence, records, documents, files, computers, software, promotional materials, and other Company property, including all copies, which come into Employee's possession by, through or in the course of his employment, regardless of the source and whether created by Employee, are the sole and exclusive property of Company. Upon termination of Employee's employment for any reason by either Party, and at any time upon Company's request, Employee shall immediately return to Company all Company property, including but not limited to (x) documents, papers, records, specifications, drawings, lists, correspondence, catalogues or the like and (y) keys, credit cards, mobile telephones, computer and related equipment, security passes, accounts and the like relating to Company's business, in each case, which is in Employee's possession or under Employee's control and Employee shall not take copies of the same without Company's express written authority. Employee shall not destroy any Company property, such as by deleting electronic mail or other files, other than in the normal course of his employment. Employee further agrees that should he discover any Company property or Confidential Information (as defined below) in his possession after the return of such property has been requested, he shall return it promptly to Company without retaining copies, summaries or excerpts of any kind or in any format whatsoever.

8.     **Non-Competition and Non-Solicitation.**

(a)     Definitions. The following definitions apply to this Section 8:

i.     **Prospective Customer** means any person, firm, company or other business who was at the Termination Date and with Employee's knowledge negotiating with Company or any Group Company with a view to dealing with the Business, Company or any affiliate within the global Capital Markets Division as a customer;

ii.     **Restricted Business** means the business of securities, commodities and/or swaps trading relating to the sale or purchase of securities and/or commodities, options and structured products of any kind, of the sort carried on by the Business or Company in which Employee was involved during the 12 months immediately prior to the Termination Date;

iii.     **Restricted Customer** means any person, firm, company or other business who was at any time in the 12 month period ending with the Termination Date a customer of the Business or Company; and

iv.     **Termination Date** means the date on which Employee's employment with Company terminates for any reason.

6

(b)    During the Employment Period, Employee will have access to Confidential Information relating to the business of the Business, Company or any Group Company, and personal knowledge and influence over clients, customers and employees of the Business, Company or any Group Company. Employee agrees with Company that to protect the Business, Company's (and any and all Group Company's) Confidential Information and goodwill:

i.    Non-Competition. During the Employment Period and for a period of three (3) months after the Termination Date (the "Non-Competition Period"), Employee shall not compete with the business of the Business or Company by being directly or indirectly employed or engaged in any capacity by any person, firm or company which engages in or provides Restricted Business to Restricted Customers or Prospective Customers (the "Non-Competition Obligations");

ii.    Non-Dealing with Customers. During the Employment Period and for a period of six (6) months after the Termination Date (the "Non-Solicitation Period"), Employee shall not, either on his own account or for any person, firm or company directly or indirectly have any business dealings or transact business in relation to Restricted Business with any Restricted Customer or Prospective Customer of the Business or Company;

iii.    Non-Solicitation of Customers. During the Non-Solicitation Period, Employee shall not, either on his own account or for any person, firm or company, directly or indirectly in relation to the Restricted Business solicit or endeavour to solicit or entice the business of any Restricted Customer or Prospective Customer;

iv.    Non-Solicitation of Directors/Employees. During the Employment Period and for a period of twelve (12) months after the Termination Date, Employee shall not, either on his own account or for any person, firm or company, directly or indirectly solicit or entice away or endeavour to solicit or entice away any director or employee of the Business or Company; provided, that the foregoing shall not be violated by general solicitation not targeted at the prohibited group or by Employee serving as a reference upon request.

v.    Prohibited Representations. Employee shall not, at any time after the Termination Date for the purpose of carrying on any trade or business, represent or allow himself to be represented, or held out as having any present association with the Business, Company, or any Group Company;

vi.    Prohibition Against Use of Words "ED&F Man". During the Employment Period and at any time after the Termination Date, Employee shall not carry on any trade or business whose name incorporates the words "ED&F Man" or any deviation or extension thereof which is likely or which may be confused with the name of the Business, Company or any Group Company; and

vii.    Mutual Non-Disparagement.  During the Employment Period and at any time after the Termination Date, (A) Employee shall not make any derogatory or disparaging comments concerning the Business, Company or any Group Company or any of its or their officers, directors or employees and (B) Company shall not, and shall instruct Company's and each Group Company's directors, officers and management-level employees not to, make any derogatory or disparaging comments concerning Employee.

(c)    The restrictions contained above are held by the Business and Company for itself and on trust for any other Group Company and shall be enforceable by the Business on their behalf or by any Group Company (at their request).

(d)    Employee agrees that during any restricted period Employee shall provide a copy of the restrictions contained above to any employer or prospective employer or any other party with which Employee becomes or will become engaged or provide services.

(e)    Employee acknowledges and agrees that, based upon his education, experience, and training, the restrictions contained in this Section 8 will not prevent him from earning a livelihood and supporting himself and his family during the relevant time period. Employee further acknowledges that, a geographic limitation on the restrictive covenants set forth above would not adequately protect the Business and Company's legitimate business interests.

(f)    Employee acknowledges and agrees that the restrictions contained in Section 8 are necessary for the protection of the business, confidential information, customer connections, goodwill and other legitimate interests of the Business and each Group Company and are considered by Employee to be reasonable for such purposes.  Employee agrees that any material breach of Section 8 will cause the Business or Company and/or any Group Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Business or Company shall have the right to seek specific performance and injunctive relief without posting a bond.  In addition, in the event of Employee's breach or threatened breach of the covenants contained in this Section 8, Employee agrees that he shall be responsible for any fees and costs, including reasonable attorneys' fees, incurred by the Business or Company to the extent the Business or Company successfully enforces the covenants contained in this Section 8.

(g)    If any restriction set forth in this Section 8 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, the Parties hereby jointly request that the Court interpret the restrictions to extend over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(h)    The existence of a claim, charge, or cause of action by Employee against the Business or Company, other than Company's failure to provide the payments set forth in Section 5 herein during the Non-Competition Period, as applicable, shall not constitute a defense to the enforcement by the Business or Company of the foregoing restrictive covenants.

(i)    The provisions of this Section 8 shall apply regardless of the reason for the termination of Employee's employment.

8

(j)     If it shall be judicially determined that Employee has violated Section 8(b)(i), 8(b)(ii), 8(b)(iii) and/or 8(b)(iv), then the period applicable to such obligation shall automatically be extended by a period of time equal in length to the period during which such violations(s) occurred.

**9.     Protection of Confidential Information.**

(a)     Definitions. The following definitions apply in this Agreement:

i.     **Confidential Information** means and shall include, but not be limited to, any non-public or otherwise confidential information which relates to any and all information (whether or not recorded in documentary or electronic form or on computer disk or tape), which is imparted in confidence or which is of a confidential nature or which Employee reasonably regards as being confidential or a trade secret, concerning the business, business performance or prospective business, financial information or arrangements, plans or internal affairs of the Business, Company, any Group Company or any of their respective customers to whom they owe an obligation of confidentiality including, without prejudice to the generality of the foregoing, all client or customer lists, price sensitive information, technical information, reports, interpretations, forecasts, records, corporate and business plans and accounts, business methods, financial details, projections and targets, remuneration and personnel details, planned products, planned services, marketing surveys, research reports, market share and pricing statistics, budgets, fee levels, computer passwords, the contents of any databases, tables, know how documents or materials, commissions, commission charges, pricing policies and all information about research and development, the Business, Company's or any Group Company's suppliers', customers' and clients' names, addresses (including email), telephone, facsimile or other contact numbers and contact names, the nature of their business operations, their requirements for services supplied by the Business, Company or any Group Company and all other confidential aspects of their relationship with the Business, Company or any Group Company;

ii.     **Documents** means (without limitation) letters, facsimiles, memoranda, disks, notes, records, texts, files, emails, memory devices, notebooks, tapes or other medium whether or not eye-readable and copies thereof on which Confidential Information may from time to time be recorded or referred to.

(b)     Employee shall not (except with the prior written consent of the Business or Company) except in the proper course of Employee's duties during the Employment Period, or at any time thereafter:

i.     disclose or use for Employee's own or for another's purpose or benefit any Confidential Information which Employee may learn or acquire during his employment except as required by a court of law or any regulatory body or that which may be in or become part of the public domain other than through any act or default on Employee's part;

ii.     copy or reproduce in any form or by or on any media or device or allow others access to copy or reproduce any Documents; or

9

       iii.    remove or transmit from the Business, Company's or any Group Company's premises any Documents on which Confidential Information may from time to time be recorded or referred to.

       (c)    In the event that, at any time during the Employment Period or at any time thereafter, Employee receives a request to disclose any Confidential Information under the terms of a subpoena, order or other legal process issued by a court or by a governmental body, or under its authority, Employee agrees to notify the Business or Company as soon as practicable (to the extent permitted by law and not resulting in an ethical or other conflict of interest) of such request, at Company's reasonable request and sole expense, to consult with the Business or Company on the advisability of taking legally available steps to resist or narrow such request and, if disclosure of such Confidential Information is required to prevent Employee from being held in contempt or subject to other penalty, to furnish only such portion of the Confidential Information as, in the written opinion of counsel, Employee is legally compelled to disclose, and to exercise Employee's reasonable efforts to obtain an order or other reliable assurance and to request that confidential treatment will be accorded to the disclosed Confidential Information.

       (d)    Notwithstanding the above and notwithstanding any other provision of this Agreement: (i) Employee is not in any way prohibited from reporting information to, or participating in any investigation or proceeding conducted by, the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), or any federal, state, or local governmental agency or entity; and (ii) Employee is not in any way precluded from providing information in response to a valid subpoena, court order, or regulatory request. Employee acknowledges the following disclosure, made pursuant to Federal law, specifically 18 U.S.C. §1833(b):

> An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

Employee acknowledges and agrees that nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or to create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

       (e)    Nothing in this Agreement or elsewhere shall prevent Employee from: (i) cooperating with, or participating in, any investigation conducted by any governmental agency; (ii) making truthful statements, or disclosing documents and information, to the extent reasonably necessary in connection with any litigation, arbitration or mediation involving Employee's rights or obligations under this Agreement or otherwise; (iii) retaining, and using appropriately (e.g., not in connection with violating any non-competition or non-solicitation

restriction), documents and information relating to Employee's personal rights and obligations and Employee's contact list; (iv) disclosing Employee's post-employment restrictions in confidence in connection with any potential new employment or business venture; (v) disclosing documents and information in confidence to any attorney, financial advisor, tax preparer, or other professional for the purpose of securing professional advice; (vi) using and disclosing documents and information at the request of Company or its attorneys and agents; or (vii) using and disclosing documents and information in connection with good faith performance of Employee's duties for Company or any of its affiliates.

**10.    Intellectual Property.**

(a)    Definitions. The following definitions apply in this Section 10:

i.    **Invention** means software, inventions, or improvements, enhancements or modifications to any inventions, technology or software;

ii.    **Intellectual Property Rights ("IPR")** means copyrights, patents, rights in inventions, utility models, rights in know how, trade marks, service marks, unregistered design rights, registered design rights, database rights, semi-conductor topography rights and all other intellectual property rights (whether or not registered and including registrations and applications for registration) and all similar rights or forms of protection which may exist anywhere in the world;

iii.    **Works** means all written materials, articles, presentations, figures, notes, diagrams, discoveries, ideas, developments, processes, plans, designs, formulas, specifications, programs, including computer software, and any other matter or work whatsoever, which Employee may conceive, create or develop, whether alone or with others, during the Employment Period and applicable to the business of the Business, Company, regardless of whether or not conceived, created or generated at the direction of the Business, Company, within the scope of Employee's employment or was created during or outside of work hours.

(b)    It is contemplated that Employee may in the course of his employment with the Business, Company or Group create, author or originate (either alone or jointly with others) Inventions and Works. Employee shall promptly disclose to the Business or Company full details of any Inventions and Works and shall provide further details, explanations and demonstrations as the Business, Company from time to time requests. All IPRs subsisting in any Inventions or Works developed subsequent to the Commencement Date shall be the exclusive property of Company and any IPRs subsisting in any Inventions or Works developed prior to the Commencement Date shall be the exclusive property of Employee. To the extent that such IPRs do not vest automatically in the Business or Company by operation of law, Employee hereby assigns to Company all future copyright, unregistered design rights and database rights, and hereby agrees to assign to Company all other future IPRs, which Employee may own and which may subsist in any Inventions or Works for their full term of protection (including any extensions, revivals and renewals) together with the right to sue and claim remedies for past infringement. To the extent permitted by law Employee hereby irrevocably and unconditionally waives in favor of Company, its licensees and successors in title, all current and future moral rights (or similar rights existing in any part of the world) which Employee may have in respect of any Inventions or Works.

11

(c)     During the Employment Period and thereafter, without limit in time, Employee shall at the request and expense of Company assist Company during reasonable hours and scope to file, prosecute, obtain and maintain registrations and applications for registration of any IPRs subsisting in, or protecting, any Inventions and Works, and to commence and prosecute legal and other proceedings against any third party for infringement of any IPRs subsisting in, or protecting, any Inventions or Works and to defend any proceedings or claims made by any third party that the use or exploitation of any Inventions or Works infringes the IPRs or rights of any third party.

(d)     Employee shall not disclose the subject matter of any Inventions or Works to any person outside the Business or Company without the prior consent of Company. Employee acknowledges that any unauthorized disclosure of such subject matter may prevent Company from obtaining patent or registered intellectual property protection for such Inventions or Works.

(e)     During the Employment Period and thereafter without limit in time, Employee shall at the request and expense of Company promptly execute and do all reasonable acts, matters and documents necessary to give Company the full benefit of the provision of this Section 10.

**11.     Data Protection.** The Business, Company and any Group Company may hold information about Employee for a number of purposes connected with Employee's employment for example, payroll operations and the administration of employee benefits. Employee hereby consents to Personal Data (including, where appropriate, "Sensitive Personal Data"), as defined below, held about Employee by the Business, Company or any Group Company any Associated Company being lawfully processed by the Business, Company or any Group Company or Associated Company, which may include information being transferred outside of the United States or the United Kingdom.

(a)     For the purposes of the Data Protection Act 1998 by signing this Agreement Employee gives his consent to the holding and processing of Personal Data and Sensitive Personal Data relating to Employee by the Business, Company and any Group Company for all purposes relating to the performance of this Agreement including but not limited to:

       i.      administering and maintaining personnel records;
      ii.      paying and reviewing salary and other remuneration and benefits;
     iii.      undertaking performance appraisals and reviews;
     iv.      maintaining sickness and other absence records;
     v.      taking decisions as to Employee's fitness for work;
     vi.      providing references and information to future employers, and if necessary, to governmental and quasi-governmental bodies for social security and other purposes;
    vii.      providing information to the future buyers and potential future buyers of Company or any other Group Companies or of the business(es) in which Employee works;
   viii.      transferring information about Employee for business reasons;
    ix.      providing and administering benefits (including if relevant, pension, life assurance, permanent health insurance and medical insurance); and
    x.      the monitoring of communications via Company's systems.

(b)     Definitions. The following definitions apply in this Section 11:

i.     **Personal Data** means data which relate to a living individual who can be identified from those data or from those data and other information which is in the possession of, or is likely to come into the possession of, the data controller and includes any expression of opinion about the individual and any indication of the intentions of the data controller or any other person in respect of the individual;

ii.     **Sensitive Personal Data** means personal data consisting of information as to racial or ethnic origin, political opinions, religious beliefs or other beliefs of a similar nature, membership of a trade union, physical or mental health or condition, sexual life, the commission or alleged commission of any offence or any proceedings for any offence committed or alleged to have been committed, including the disposal of such proceedings or the sentence of any Court in such proceedings.

**12.     Tax Consequences.** Except as otherwise specifically provided in this Agreement, the Business, Company or Group Company will have no obligation to any person entitled to the benefits of this Agreement with respect to any tax obligation any such person incurs as a result of or attributable to this Agreement, including all supplemental agreements and employee benefits plans incorporated by reference therein, or arising from any payments made or to be made under this Agreement or thereunder. Any payment made under this Agreement shall be subject to the deduction of tax as may be required by law.

**13.     Section 409A.**

(a)     This Agreement is intended to comply with, or otherwise be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and any regulations and Treasury guidance promulgated thereunder ("Section 409A of the Code") and this Agreement shall be interpreted consistent with the foregoing. If Company or Employee determines in good faith that any provision of this Agreement would cause Employee to incur an additional tax, penalty, or interest under Section 409A of the Code, the Business or Company and Employee shall use reasonable efforts to reform such provision, if possible, in a mutually agreeable fashion to maintain to the maximum extent practicable the original intent of the applicable provision without violating the provisions of Section 409A of the Code or causing the imposition of such additional tax, penalty, or interest under Section 409A of the Code. The preceding provisions, however, shall not be construed as a guarantee by the Business, Company or Group Company of any particular tax effect to Employee under this Agreement.

(b)     For purposes of Section 409A of the Code, the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments. In no event may Employee, directly or indirectly, designate the calendar year of payment. With respect to any reimbursement of expenses of, or any provision of in-kind benefits to, Employee, as specified under this Agreement, such reimbursement of expenses or provision of in-kind benefits shall be subject to the following conditions: (1) the expenses eligible for reimbursement or the amount of in-kind benefits provided in one taxable year shall not affect the expenses eligible for reimbursement or the amount of in-kind benefits provided in any other taxable year, except for any medical reimbursement arrangement providing for the reimbursement of expenses referred to in Section 105(b) of the Code; (2) the reimbursement of an eligible expense shall be made no later than the end of the year after the year in which

such expense was incurred; and (3) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

(c)     "Termination of employment," "resignation," or words of similar import, as used in this Agreement means, for purposes of any payments under this Agreement that are payments of deferred compensation subject to Section 409A of the Code, Employee's "separation from service" as defined in Section 409A of the Code.

(d)     If a payment obligation under this Agreement or otherwise arises on account of Employee's separation from service while Employee is a "specified employee" (as defined under Section 409A of the Code and determined in good faith by the Business or Company), any payment of "deferred compensation" (as defined under Treasury Regulation Section 1.409A-1(b)(1), after giving effect to the exemptions in Treasury Regulation Sections 1.409A-1(b)(3) through (b)(12)) that is scheduled to be paid within six (6) months after such separation from service shall accrue without interest and shall be paid within 15 days after the end of the six-month period beginning on the date of such separation from service or, if earlier, within 15 days after the appointment of the personal representative or executor of Employee's estate following his death.

14.     **Governing Law.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

15.     **Notices.**  Any notice provided for in this Agreement shall be provided in writing. Notices shall be effective from the date of service, if served personally on the Party to whom notice is to be given, or on the second day after mailing, if mailed by first class mail, postage prepaid. Notices shall be properly addressed to the Parties at their respective addresses or to such other address as either party may later specify by notice to the other.

16.     **Indemnification.**  Company shall indemnify and hold harmless Employee for any liability incurred by reason of any act or omission performed by Employee while acting in good faith on behalf of Company and within the scope of the authority of Employee pursuant to this Agreement and under the rules and policies of Company, except that Employee must have in good faith believed that such action was in the best interest of Company and such course of action or inaction must not have constituted gross negligence, fraud, willful misconduct, or breach of a fiduciary duty. Company shall, in addition, advance to Employee, or pay directly, all costs and expenses incurred by Employee in connection with the foregoing, or in connection with Employee seeking to enforce Employee's rights under this section, within fifteen (15) days after receiving written notice requesting such an advance and enclosing customary supporting documentation, provided only that such notice includes an unsecured undertaking by Employee to repay the amount advanced if Employee is ultimately determined, by a court of competent jurisdiction, not to be entitled to indemnification against such costs and expenses. The foregoing rights to indemnification and advancement will continue indefinitely, whether or not Employee's services for Company have terminated. Nothing herein shall limit any right that Employee may have in respect of indemnification, contribution, advancement, or liability insurance coverage under any other plan, agreement, policy or arrangement of Company or any Group Company, or under applicable law.

14

**17.    Relief.** Employee acknowledges and agrees that the remedy at law available to Company for breach of any Employee's obligations under this Agreement would be inadequate. Employee therefore agrees that, in addition to any other rights or remedies that Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision contained in this Agreement, without the necessity of proof of actual damage.

**18.    Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto, their heirs, personal representatives, successors and assigns. The Parties understand that the obligations of Employee are personal and may not be assigned by him.

**19.    Entire Agreement.** This Agreement contains the entire understanding of Employee and Company with respect to employment of Employee and supersedes any and all prior understandings, written or oral.    This Agreement may not be amended, waived, discharged or terminated orally, but only by an instrument in writing, specifically identified as an amendment to this Agreement, and signed by all parties. By entering into this Agreement, Employee certifies and acknowledges that he has carefully read all of the provisions of this Agreement and that he voluntarily and knowingly enters into said Agreement.

**20.    Severability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be deemed severable from the remainder of this Agreement, and the remaining provisions contained in this Agreement shall be construed to preserve to the maximum permissible extent the intent and purposes of this Agreement.

**21.    Miscellaneous.**

(a)    No delay or omission by Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by Company on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.

(b)    The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

(c)    The language in all parts of this Agreement will be construed, in all cases, according to its fair meaning, and not for or against either Party hereto. The Parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement.

(d)    The obligations of either Party under this Agreement are contingent upon the other Party's performance of its obligations under this Agreement.

15

(e)    In the event of any inconsistency between any provision of this Agreement and any provision of any employee handbook, personnel manual, program, policy or arrangement of the Business or Company or any Group Company, or any provision of any agreement, plan or corporate governance document of any of them, the provisions of this Agreement shall control unless this Agreement provides otherwise or Employee otherwise agrees in a writing that expressly refers to this Agreement. Company agrees, and will cause each other member of the Group Company to agree, not to impose any restrictions, enforceable by injunction, on Employee's post-employment activities, other than those expressly set forth in this Agreement.

-- Signature page follows --

16

IN WITNESS WHEREOF, each of the Parties hereto has caused this Employment Agreement to be duly executed on the date set forth above.

**E D & F MAN SERVICES INC.**

By:  _____

      **Phil Lyons**
      **Senior HR Business Partner**

**EMPLOYEE**

_____

**David Hoffman**

17

## Schedule 1 – Calculation of Quarterly Payment

The calculation of the Quarterly Payment is as follows:

### Terms

*Net Pre-Tax Profit:*
Gross revenue less all direct costs, indirect costs, personnel costs, financing and allocated costs, regardless of whether or not charges are passed on to individual members of the supervised groups; provided, that all indirect costs, and financing and allocated costs will reduce Net Pre-Tax Profit, and is calculated in the same manner (but not as to amount) as, how such costs are allocated to the other businesses of E D & F Man Services Inc. and/or other E D & F Man entities.

*Other Assigned Businesses:*
Should from time to time, with the written agreement of the CEO Americas and the Global CEO, Employee agree to oversee certain other non-Interest Rate Derivative business lines, said business will be considered 'Other Assigned Businesses' for the purposes of Performance Compensation.

### Compensation

*Annual Salary:*
$300,000

Employee agrees that Company may deduct from the Salary (or any other sums due to Employee) any amounts due to Company including, without limitation, any overpayment of Salary, loan or advance.

*Performance Compensation:*
Net Pre-Tax Profit of the new Interest Rate Derivative business x 10%, calculated quarterly and added to the "Quarterly Payment".
+
Net Pre-Tax Profit of 'Other Assigned Businesses' x 5%, calculated quarterly and added to the "Quarterly Payment".

Quarterly Payment will be made in the normal payroll cycle, no later than forty-five (45) days after the last day of the quarterly cycle. Should any deficit exist, said deficit will be carried over into the calculation for the next quarter. Should any dispute arise regarding the payment of a bonus under this scheme the reasonable decision of the Global CEO of the Capital Markets business will be final.

Company will provide Employee with information sufficient to determine all the costs associated with the calculation of the Performance Compensation, and will assist Employee in budgeting the same.

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| RVASSETS LTD., | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | Case No.: 1-23-cv-14192 |
|  | : | |
| MAREX CAPITAL MARKETS INC., DAVID HOFFMAN AND JASON MARGIOTTA | : | Honorable Sara L. Ellis, U.S.D.J. |
|  | : | |
| Defendants. | : | |
|  | : | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.    Defendants .......................................................................................................... 2

    B.    Plaintiff RVassets and its Customers ................................................................ 3

    C.    Plaintiff Provides Limited Access to the RVa Software.................................... 3

    D.    Marex Launches OptionsLive............................................................................ 4

    E.    Plaintiff Waits Three Years to File this Lawsuit .............................................. 4

LEGAL STANDARD........................................................................................................... 5

ARGUMENT ....................................................................................................................... 6

I.     The Court Should Dismiss Plaintiff's Trade Secret Misappropriation Claims under the ITSA and DTSA (Counts 1 and 2)................................................................... 7

    A.    Plaintiff's Theory of Misappropriation Is Implausible ..................................... 7

    B.    Plaintiff Does Not Adequately Allege Defendants' Access to Trade Secrets ...... 11

    C.    Plaintiff Does Not Adequately Allege Misappropriation ..................................... 17

II.    The Court Should Dismiss Plaintiff's Claims for Improper Group Pleading.................. 18

III.   The Court Should Dismiss Plaintiff's Remaining Claims (Counts 3 through 8).............. 20

    A.    Plaintiff's Remaining Claims Are Preempted by the ITSA................................... 20

    B.    Even if Plaintiff's Remaining Claims Were Not Preempted, the Complaint Fails to Adequately Plead Them........................................................................ 23

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

## Statutes

18 U.S.C. § 1839 ............................................................................................ 9, 11, 17

765 ILCS § 1065/2 ............................................................................................. 11, 17

765 ILCS § 1065/8 ..................................................................................................... 20

Fed. R. Civ. Proc. 8 ................................................................................................ 1, 20

Fed. R. Civ. Proc. 9 ............................................................................................ 1, 6, 27

Fed. R. Civ. Proc. 12 ................................................................................................... 5

## Cases

*Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888 (N.D. Ill. Mar. 4, 2019) ......... 7, 16

*Aetna Life Ins. Co. v. Youtzy*, 1991 WL 160404 (N.D. Ill. Aug. 15, 1991) ................................. 28

*Agency Solutions.com, LLC v. Trizetto Grp.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011) ............ 9, 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 6, 8, 11, 12

*Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841 (7th Cir. 2007)............................... 29

*Bank of Am., N.A. v. Knight*, 725 F.3d 815 (7th Cir. 2013) ........................................................ 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 5, 6, 8

*Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520 (N.D. Ill. 2022).................... 24

*Brown v. Adidas Int'l.*, 938 F. Supp. 628 (S.D. Cal. 1996) .................................................. 10, 18

*Carpenter v. Aspen Search Advisers, LLC*, 2011 WL 1297733 (N.D. Ill. Apr. 5, 2011) ............. 15

*Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*,
2017 WL 4269005 (N.D. Ill. Sept. 26, 2017) ............................................................... 20

*Christopher Glass & Aluminum, Inc. v. O'Keefe*,
2017 WL 2834536 (N.D. Ill. June 30, 2017) ................................................................ 21

*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir. 1992 ......... 7, 12

*Creative Writer Software, LLC v. Schechter*,
2023 WL 6786796 (C.D. Cal. Sept. 6, 2023) ............................................................ 13, 14

*Decurtis LLC v. Carnival Corp.*, 2021 WL 1968327 (S.D. Fla. Jan. 6, 2021)............................ 13

*Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358 (Ill. 1998) ...................................................... 25

*DSC Logistics, Inc. v. Innovative Movements, Inc.*,
   2004 WL 421977 (N.D. Ill. Feb. 17, 2004) ........................................................................ 23

*ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254 (N.D. Ill. 2020) ............................ 22

*Exceed Holdings LLC v. Chicago Bd. of Options Exch.*,
   2018 WL 4757961 (S.D.N.Y. Sept. 30, 2018) .............................................................. 10, 18

*Filter Dynamics Int'l, Inc. v. Astron Battery, Inc.*, 311 N.E.2d 386 (Ill. App. Ct. 1974) .............. 9

*Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846 (N.D. Ill. 2011) ....... 16

*Forker v. Matanky*, 1991 WL 14067 (N.D. Ill. Feb. 1, 1991) .................................................... 28

*Free Green Can, LLC v. Green Recycling Enterprises, LLC*,
   2011 WL 5130359 (N.D. Ill. Oct. 27, 2011) ...................................................................... 27

*Hickey v. O'Bannon*, 287 F.3d 656 (7th Cir. 2002) ...................................................................... 6

*Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319 (N.D. Ill. 2020) ........................... 23

*IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002) .............................................. 12

*Int'l Serv. Assocs., Inc. v. Arco Mgmt. of Washington, D.C., Inc.*,
   1994 WL 583302 (N.D. Ill. Oct. 21, 1994) ........................................................................ 24

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
   568 F. Supp. 2d 1369 (M.D. Fla. 2008) ........................................................................ 10, 18

*LiiON, LLC v. Vertiv Grp. Corp.*, 2021 WL 4963610 (N.D. Ill. Oct. 26, 2021) ......................... 18

*Marc Dev., Inc. v. Wolin*, 845 F. Supp. 547 (N.D. Ill. 1993) ...................................................... 25

*Master Tech Prod., Inc. v. Prism Enters., Inc.*,
   2002 WL 475192 (N.D. Ill. Mar. 27, 2002) .................................................................. 21, 23

*Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587 (7th Cir. 2001) ............................................ 12

*Mut. Life Ins. Co. of New York v. Veselik*, 1998 WL 30672 (N.D. Ill. Jan. 23, 1998) ........... 16, 17

*Nilssen v. Motorola, Inc.*, 963 F. Supp. 664 (N.D. Ill. 1997) .................................................... 12

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*,
   2017 WL 4340123 (N.D. Ill. Sept. 29, 2017) .................................................................... 21

*Opus Fund Servs. (USA), LLC v. Theorem Fund Servs., LLC*,
   2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) .......................................................... 11, 16, 20

*PetroChoice LLC v. Amherdt*, 2023 WL 2139207 (N.D. Ill. Feb. 21, 2023) ................................ 7

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
   631 F.3d 436 (7th Cir. 2011) ............................................................................................ 27

*Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*,
  2010 WL 624709 (N.D. Ill. Feb. 18, 2010) ............................................................ 29

*Pope v. Alberto-Culver Co.*, 694 N.E.2d 615 (Ill. App. Ct. 1998) .............................. 23

*Principia Partners LLC v. Swap Fin. Grp.*, 2019 WL 4688711 (S.D.N.Y. Sept. 26, 2019)........ 14

*RMB Fasteners, Ltd. v. Heads & Threads Int'l, LLC*,
  2012 WL 401490 (N.D. Ill. Feb. 7, 2012) ............................................................ 29

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ...................................................... 15

*Sain v. Nagel*, 997 F. Supp. 1002 (N.D. Ill. 1998) ........................................................ 25

*Seaga Mfg., Inc. v. Fortune Metal, Inc.*, 2001 WL 1196184 (N.D. Ill. Oct. 10, 2001) ............... 22

*Segerdahl Corp. v. Ferruzza*, 2018 WL 828062 (N.D. Ill. Feb. 10, 2018)........................... 11, 14

*Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825 (N.D. Ill. 2009).......................................... 28

*Smietana v. Stephens*, 2023 WL 3737720 (N.D. Ill. May 30, 2023) ............................... 13

*Smith v. Duffey*, 2008 WL 4874088 (N.D. Ill. June 23, 2008) ...................................... 27

*Smoketree Holding LLC v. Apke*, 2023 WL 6377272 (D. Ariz. Sept. 29, 2023)..................... 13

*Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724 (7th Cir. 2014)............................... 20, 21, 23

*Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797 (7th Cir. 2018) ............... 6, 27

*Sweeney v. Forrest Redi-Mix Inc.*, 2009 WL 10742115 (N.D. Ill. Oct. 29, 2009) ................... 27

*Thermal Zone Prod. Corp. v. Echo Eng., Ltd.*,
  1993 WL 358148 (N.D. Ill. Sept. 14, 1993) ............................................................ 12, 14

*Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968 (N.D. Ill. 2000) ..................... 23

*Tucker v. Charles Schwab Bank*, 2013 WL 1337329 (N.D. Ill. Mar. 29, 2013) ..................... 29

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993).................... 3

*Vincent v. City of Chicago*, 2005 WL 818410 (N.D. Ill. Apr. 6, 2005)............................... 26

*W. Union Co. v. Kula*, 2017 WL 11562395 (N.D. Ill. June 13, 2017) ............................... 22

*WeInfuse, LLC v. InfuseFlow, LLC*, 2021 WL 1165132 (N.D. Tex. Mar. 26, 2021) ................ 14

*Wobble Light, Inc. v. McLain/Smigiel P'ship*, 890 F. Supp. 721 (N.D. Ill. 1995)................... 26

*Woodard v. Harrison*, 2008 WL 4724370 (C.D. Ill. Oct. 24, 2008) .................................. 22, 23

*You Map, Inc. v. Snap. Inc.*, 2021 WL 106498 (D. Del. Jan. 12, 2021) ............................. 13

*Zummo v. City of Chicago*, 345 F. Supp. 3d 995 (N.D. Ill. 2018) .................................... 25

## INTRODUCTION

Plaintiff RVasset Ltd.'s Complaint embroiders a story of purported trade secret misappropriation based on claims that one of its customers stole information by using the front-end, external-facing graphical user interface of a software program and asking customer service about the program. The story is wholly implausible, for multiple reasons – not least is how such readily-available information could even constitute trade secrets. This lawsuit should be dismissed for failing the plausibility requirements of *Twombly/Iqbal* and their progeny, as well as multiple independent bases under the standards for pleading required by Federal Rules of Civil Procedure 8 and 9, and the pre-emption of tort claims that mirror statutory claims for misappropriation.

As Plaintiff acknowledges, the access that it provided to its options pricing and trading software platform called "RVa Software" to its customers, such as Defendant Marex Capital Markets Inc. (formerly E D & F Man Capital Markets Inc. ("Marex")),[1] was not unfettered; instead, the access was "limited," in Plaintiff's words. Plaintiff makes clear that the "details of the functionality of the RVa Software" and its "inner workings" – such as its source code, algorithms, and formulas – are not available from that user interface and are only accessible on the internal, backend and only to the creator of the software – *i.e.*, not its customers. Much the same way that someone who accesses Google's search browser, Amazon's online store, or Facebook does not have access to the "inner workings" of those software programs by using the external-facing interface, Defendants did not have access to the "inner workings" of RVa Software. And Plaintiff alleges no facts showing that Defendants had any access to the "inner workings" of the RVa Software – where Plaintiff claims the "trade secrets" reside – through other means.

---

[1] For ease of reference, "Marex" as used hereinafter will refer to the company acquired, *i.e.*, E.D.&F. Man Capital Markets Inc., unless otherwise specified. And for clarity, the Complaint is cited herein for reference to Plaintiff's allegations for the Court to consider on a motion to dismiss – and this is not, and should not be construed as, any admission of the allegations contained therein.

Implicitly acknowledging this, Plaintiff resorts to making wholly conclusory assertions that Defendants "must have" misappropriated trade secrets because they developed and launched an alternative options pricing and trading platform. But courts repeatedly have found that "*must have done it*" allegations like this fail to state a claim because they are based on speculation and a logical fallacy—*post hoc ergo propter hoc*. Without facts plausibly demonstrating that a defendant had access to and used the alleged trade secrets (in this case, the "inner workings" of RVa Software), a trade secret claim must fail. So too must all the other claims, in that they are based on this misappropriation theory.

Tellingly, Plaintiff waited more than three years after the launch of a trading platform by Defendants called OptionsLive to initiate litigation. (Not coincidentally, it also comes after the transaction by which Marex was acquired, *see* Doc. No. 1, Complaint ("Compl.") at n.1.) This case plainly is not about Plaintiff's attempting to protect information that it believes were trade secrets, because it knows no Defendant had access to any such information. Instead, it is about Plaintiff's seizing on Marex's recent acquisition and it having ended its customer relationship with Plaintiff and moved its options pricing and trade execution business to a different software platform. The Court should reject Plaintiff's eleventh-hour attempt to manufacture a claim and dismiss this case.

## BACKGROUND

### A.     Defendants

Marex is a financial brokerage business. (*Id.* ¶ 15) As part of its business, Marex provides brokerage services to its clients, including executing options and other trades for clients' trading on the Chicago Mercantile Exchange ("CME"). (*Id.* ¶ 19) Defendants Jason Margiotta and David Hoffman worked in connection with OptionsLive, among other things. (*Id.* ¶ 24)

2

**B.      Plaintiff RVassets and its Customers**

Plaintiff RVassets alleges it is a financial technology company that developed a software platform called RVa Software for pricing and executing trades of options listed on the CME.  (*Id.* ¶ 35)  As is common with software developers, Plaintiff marketed and sold access to its RVa Software to a number of third-party brokers and hedge funds.  (*Id.* ¶¶ 49, 52)

In 2016, a corporate affiliate of ED&F Man Capital Markets Inc. (*see supra* at 1 n.1) named ED&F Man Capital Markets Limited entered into an agreement with Plaintiff to license the RVa Software.  (*Id.* ¶ 54)  That agreement granted access to the RVa Software platform to all affiliates of ED&F Man Capital Markets Limited, on a non-exclusive basis.[2]  (*Id.* ¶¶ 53–55)

**C.      Plaintiff Provides Limited Access to the RVa Software**

After Marex became one of its customers, Plaintiff provided Marex and certain of its employees with "limited access" to the RVa Software.  (*Id.* ¶¶ 46, 49, 60)  The RVa Software was an internet-based software platform, and thus Marex was not provided any physical software.  (*Id.*)  Instead, like any other customer, Marex and its employees were provided user login credentials to access the internet-based, front-end graphical user interface of the RVa Software.  (*Id.*)

Not surprisingly, the access to the user interface did not include access to any of the backend, internal-to-RVassets portions of the RVa Software.  According to the Complaint, "[t]he details of the functionality of the RVa Software, and the proprietary confidential algorithms, data sets, processes, methods, compilations, programs formulas designs, techniques, and procedures embodied within the RVa Software are not readily available or ascertainable to any person outside of RVassets."  (*Id.* ¶ 50)  The *only* person with access to the "inner workings" of the RVa Software,

---

[2]  Copies of the agreements are attached as Exhibits 1–7.  The Court may properly consider these agreements on this motion to dismiss because they are "referred to" in the Complaint and "central" to it.  *See Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (district court properly considered letter of intent and related correspondence on motion to dismiss).

including its source code, is the individual who created the RVa Software, and the details of those "inner workings," according to Plaintiff, are kept under lock and key.  (*Id.* ¶ 45)

### D.      Marex Launches OptionsLive

On September 29, 2020, Marex publicly launched OptionsLive.  (*Id.* ¶ 110)  OptionsLive is a software platform for electronically pricing and executing trades of listed options through the CME Direct API.  (*Id.* ¶¶ 73, 111, 117)  Plaintiff states that in developing OptionsLive, Mr. Hoffman and Mr. Margiotta wanted the platform "to have direct access to the CME market data for interest rate options."  (*Id.* ¶ 26)  Plaintiff does not allege that the RVa Software had direct access to CME market data through the CME Direct API.  (*Id.* ¶ 23)

Despite the public launch of OptionsLive in September 2020, Plaintiff did not immediately terminate its customer relationship with Marex.  (*Id.* ¶ 122)  The customer relationship between Marex and Plaintiff continued until "the end of 2020."  (*Id.*)  Plaintiff does not allege that it was the party that terminated the customer relationship or that it did so out of any perceived breach of the license – and indeed alleges nothing about the circumstances of that termination.

### E.      Plaintiff Waits Three Years to File this Lawsuit

Unlike the usual owner of purported trade secrets that runs off to court at the first hint of supposed misappropriation, Plaintiff waited three years to file this lawsuit.  Plaintiff now claims that "Defendants" misappropriated its purported "trade secrets" in the RVa Software and used those "trade secrets" in the OptionsLive platform.  (*Id.* ¶¶ 28–31, 70)

The Complaint is barren with respect to the details of the purported misappropriation. While Plaintiff alleges that it provided user login credentials to the front-end user interface to Mr. Margiotta, it does not allege that it provided any login credentials to Mr. Hoffman.  (*Id.* ¶ 78) Plaintiff, instead, attempts to impute access to the software platform to Mr. Hoffman by alleging that one of its employees observed that Mr. Hoffman shared a desk with and worked closely with

4

Mr. Margiotta and two other brokers to whom Plaintiff provided logins. (*Id.* ¶ 79) Plaintiff then claims that "Defendants" used their access to the user interface to "probe the inner workings" to discover "trade secrets" "embodied in the RVa Software" to use in the OptionsLive platform. (*Id.* ¶¶ 85–86) Plaintiff claims that Defendants probed those "inner workings" by asking questions to customer services representatives, observing trades in the open market that resulted from use of the software, and running sample searches on the software's user interface. (*Id.* ¶¶ 89–98)

When it comes to the specifics of what "trade secrets" in the "inner workings" Defendants supposedly stole through these alleged actions, Plaintiff provides none. Plaintiff, instead, lists everything that it can think of that might be a trade secret – in its words: "functionality, algorithms, data sets, processes, methods, compilations, programs, formulas, patterns, programs, methods, designs, techniques, plans, prototypes, codes, and procedures" – and suggests that Defendants must have had access to something that was a trade secret that they misappropriated. (*Id.* ¶¶ 42, 144, 168 (listing the supposed trade secrets)) But the inference that Plaintiff seeks is directly contradicted by the allegations that these "inner workings" of the RVa Software were not ascertainable from the user interface and were only accessible by the creator of the software. (*Id.* ¶¶ 44, 50)

The Complaint leaves the Court and Defendants guessing about when and how Plaintiff believes Defendants accessed information embedded in the RVa Software, what purported trade secret in the "inner workings" of that software any Defendant supposedly discovered, and what purported trade secrets any Defendant allegedly used in the OptionsLive platform. These deficiencies in Plaintiff's Complaint necessitate Defendants' filing their motion to dismiss.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  A claim is facially plausible only if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint offering only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id*. (citation omitted). "[L]egal conclusions or unsupported conclusions of fact" also will not suffice.  *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).  Plaintiff must, instead, allege facts that "nudge[]" its "claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  In addition, where, as here, a plaintiff asserts claims based on alleged fraud, the plaintiff must satisfy Federal Rule of Civil Procedure 9(b).  *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018).  This means that Plaintiff must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. Proc. 9(b).

The Complaint fails to meet these standards.

## ARGUMENT

The Complaint is littered with conclusory assertions, conjecture, and gulfs between logic. The foundation of this case is built on an assertion that Defendants misappropriated supposed trade secrets that were embodied in the RVa Software.  While Plaintiff claims that the purported trade secrets reside in the "inner workings" of the RVa Software, it alleges no facts demonstrating that Defendants had access to the software's "inner workings" or any alleged trade secrets contained there.  On the contrary, Plaintiff specifically asserts that Marex, as a customer, had "limited access" to the RVa Software.  Defendants' only access to the software was to the user interface, and Plaintiff makes plain that no trade secrets in the "inner workings" are ascertainable from that user interface.  This, of course, makes sense in that – as Plaintiff states – a number of brokers and hedge funds are also customers of Plaintiff and many of their employees have access to the user interface. What responsible owner of trade secrets makes them ascertainable through ordinary use of the

software's user interface or talking with customer service – and how could they ever qualify as trade secrets in light of being so freely available?  Further, there are no facts in the Complaint that show that Defendants had access to the "inner workings" through other means.  The limitations on Defendants' access to the RVa Software – as a customer – make Plaintiff's story of misappropriation implausible and fatally infect its trade secret claims under the Illinois Trade Secrets Act ("ITSA") and Defend Trade Secrets Act ("DTSA").  That Plaintiff has not – and cannot – allege any facts to push its theory past what is "merely conceivable" or "possible" to a plausible claim requires dismissal of these claims.

Plaintiff's remaining claims fare no better.  It is black letter law that statutory and common law claims premised on alleged trade secret misappropriation, like the ones Plaintiff asserts, are pre-empted by the ITSA.  Even if they were not, Plaintiff fails to sufficiently allege the facts necessary to state a claim under any of the theories it presses – against any Defendant.

## I.  The Court Should Dismiss Plaintiff's Trade Secret Misappropriation Claims under the ITSA and DTSA (Counts 1 and 2)

To state a claim under either the ITSA or DTSA, Plaintiff must plausibly allege that the information at issue was (1) a trade secret, (2) misappropriated, and (3) used in Defendants' business.  *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992); *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 896 (N.D. Ill. Mar. 4, 2019) (same).[3]  The Complaint fails each element.

### A.  Plaintiff's Theory of Misappropriation Is Implausible

The Supreme Court made clear in *Twombly* and *Iqbal* that a plaintiff must do more than plead facts that are "merely consistent" with a defendant's liability because that "stops short of the

---

[3]  As this District has recognized, "DTSA and ITSA claims follow the same analysis" and thus should be dismissed together where the claims fail to meet the elements.  *PetroChoice LLC v. Amherdt*, 2023 WL 2139207, at *7 (N.D. Ill. Feb. 21, 2023).

line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). A plaintiff must, instead, allege facts that push the defendant's liability past being merely conceivable to being plausible. *Id*. at 680. The Court should not abandon "common sense" when making the determination of whether a complaint crosses the threshold of plausibility. *Id.* at 679.

In this case, Plaintiff asks the Court to abandon common sense and embrace a theory of misappropriation that is flatly implausible. Plaintiff's misappropriation claims rest on the assumption that Defendants had access to trade secrets embedded in the RVa Software. Plaintiff describes those purported trade secrets as the "inner workings" of the RVa Software that consist of the software's "proprietary and confidential algorithms, data sets, processes, methods, compilations, programs, formulas, designs, techniques, and procedures." **(**Compl. ¶ 42; *see also id*. ¶¶ 144, 168**)** But Plaintiff does not allege any facts that make it plausible that Defendants had access to any of these supposed "inner workings."

Marex was a customer of Plaintiff's, and Marex's employees were only provided access to the front-end user interface of the RVa Software. (*Id.* ¶¶ 46, 60) No Defendant had access to the software's backend – nor does Plaintiff allege otherwise. Defendants also did not have access to any physical media containing the software**,** (*id.* ¶ 46 (describing user interface as "network" based**)**), nor is any alleged. In every sense, Defendants' access to the RVa Software was, as Plaintiff admits, "limited." (*Id.* ¶¶ 46, 49)

Just like the user interfaces of Google's search browser, Amazon's online store or Facebook do not reveal or provide access to trade secrets associated with those programs, Plaintiff admits that the user interface of the RVa Software did not reveal or provide access to any alleged trade secrets associated with the software's "inner workings." (*Id.* ¶ 50 (stating that "[t]he details

of the functionality of the RVa Software" are "not readily available or ascertainable to any person outside of [Plaintiff]")  Indeed, Plaintiff specifically alleges that it held the "inner workings of the RVa Software" platform in strict confidence.  (*Id.* ¶ 45)  The only person who had access to those "inner workings," according to Plaintiff, is the creator of the RVa Software.  (*Id.*)

The limited access to the RVa Software that Plaintiff provided to its customers, like Marex, obviously contradicts Plaintiff's assertion of access to any trade secrets or any misappropriation.  Plaintiff attempts to spackle over the issue by claiming that each Defendant used access to the user interface to "probe [the] inner workings" of the RVa Software.  (*Id.* ¶ 85)  Plaintiff asks the Court to infer that Defendants were able to access and take things – such as the software's source code and algorithms – by simply using the software, observing trades *in the open market* that resulted from use,[4] and speaking with customer service.  (*Id.* ¶¶ 89–99)  The notion that any of this revealed trade secrets not only is contradicted by the Complaint's allegations about access to the software's "inner workings" (*id.* ¶¶ 45, 50), it is implausible.  If it were as simple as Plaintiff claims to uncover the purported trade secrets, they would be no trade secrets at all because they would be readily ascertainable.  *See* 18 U.S.C. § 1839(3)(B) (information "readily ascertainable" is not a trade secret); *Filter Dynamics Int'l, Inc. v. Astron Battery, Inc.*, 311 N.E.2d 386, 401 (Ill. App. Ct. 1974) ("[M]atters which are readily and completely disclosed by the product itself cannot constitute a trade secret . . . ."); *Agency Solutions.com, LLC v. Trizetto Grp.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011) ("[I]nformation that is reflected in the way software functions from the point of view of the user is not trade secret information. . . . because it is readily deducible to anyone using the program").

---

[4]  Akin to viewing posts on Facebook resulting from using the online platform, the trades that allegedly were observed were made in the open public market on CME – belying any notion they could be the subject of any trade secret protection.

Unable to show that the user interface gave Defendants access to any alleged trade secrets, Plaintiff resorts to pointing to the launch of OptionsLive after Marex had been a customer of Plaintiff as supposed evidence of misappropriation. (Compl. ¶¶ 114–15)  The theory goes that Defendants *must have* accessed some trade secret in the RVa Software at some time and then used it because Defendants launched a "competing software platform" after Marex and its employees were provided access the external-facing user interface of the RVa Software. (*See, e.g.*, *id.* ¶ 21) That theory, however, is built on the logical fallacy of *post hoc ergo propter hoc*.  The fact that Marex launched OptionsLive after becoming a customer of Plaintiff does nothing to establish that OptionsLive was made possible by misappropriation of trade secrets.  Courts have repeatedly rejected "must have done it" theories, like this, in dismissing trade secret claims.  *See, e.g.*, *Exceed Holdings LLC v. Chicago Bd. of Options Exch.*, 2018 WL 4757961, at *5 (S.D.N.Y. Sept. 30, 2018) (dismissing trade secret claims based on assertion that defendant "could not have launched its products without receiving [plaintiff]'s proprietary information"); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1376–77 (M.D. Fla. 2008) (dismissing trade secret claim because allegations that competitor "copied" claimant's product, made a similar competing product, and "had access to trade secrets through business dealings" were insufficient to state claim); *Brown v. Adidas Int'l.*, 938 F. Supp. 628, 634 (S.D. Cal. 1996) (alleged "design similarities" between the parties' products do "not allege sufficiently that [defendants] misappropriated [plaintiff's] designs").

The leap in logic that Plaintiff asks the Court to make is too vast.  There are no facts demonstrating that Defendants had access to any trade secrets in the RVa Software, let alone used them.  Without these facts, the Complaint tells a story of development of an alternative software platform that overlapped in some span of time with a customer relationship between Plaintiff and

Marex.  This is exactly the kind of "more likely explanation" that rebuts plausibility and requires dismissal of the claim.  *See Iqbal*, 556 U.S. at 678, 681–82 (pleading facts that are equally consistent with lawful and unlawful conduct does not establish plausibility).

**B.    Plaintiff Does Not Adequately Allege Defendants' Access to Trade Secrets**

The *sine qua non* of a trade secret claim is the existence of a trade secret.  *See Segerdahl Corp. v. Ferruzza*, 2018 WL 828062, at *3 (N.D. Ill. Feb. 10, 2018) (dismissing DTSA and ITSA claims for failure to plead a trade secret with sufficient specificity, collecting dismissal cases).  To sufficiently plead the existence of a trade secret, Plaintiff must reasonably identify the alleged trade secret and set forth sufficient facts to establish that it made "reasonable efforts to secure and maintain the secrecy" of the purported trade secret.  *Opus Fund Servs. (USA), LLC v. Theorem Fund Servs., LLC*, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018).  Plaintiff's Complaint does neither.

**1.    Plaintiff Fails to Reasonably Identify the Trade Secrets It Claims Defendants Misappropriated**

Because Plaintiff cannot point to any access by any Defendant to the "inner workings" of the RVa Software, perhaps it should not surprise that Plaintiff shotgun-pleads the identification of the purported trade secrets.  (Compl. ¶¶ 42, 144, 168)  Plaintiff cannot even get its story straight about what trade secrets make up the "inner workings" of the RVa Software.  In three places in the Complaint, Plaintiff provides *different* lists of the supposed trade secrets involved in this case. (*See id.* ¶ 42 (body of complaint); *id.* ¶¶ 144 (ITSA claim); *id.* ¶ 168 (DTSA claim))  All told, Plaintiff identifies more than twenty categories of "trade secrets" it claims are at issue in this case, comprising nearly every category of trade secret listed in the ITSA and the DTSA.  *See* 765 ILCS § 1065/2(d); 18 U.S.C. § 1839(3).  The supposed trade secrets consist of financial, business, scientific, technical, economic, and/or engineering information made up of algorithms, data sets,

processes, methods, compilations, programs, formulas, patterns, programs, methods, designs, techniques, plans, prototypes, codes, functionality, and procedures.  (Compl. ¶¶ 42, 144, 168)

Plaintiff's generic approach to pleading the trade secrets purportedly at issue in this case does not give either the Court or Defendants any idea of the "trade secrets" that Plaintiff contends Defendants misappropriated or whether they constitute trade secrets.  Is Plaintiff claiming that Defendants misappropriated a "data set"?  A "method"?  A "formula"?  A "technique"?  A "program"?  A "procedure"? Or something else?   Also, is Plaintiff claiming that whatever Defendants misappropriated was "financial," "business," "scientific," "technical," "economic," or "engineering" information?  The Complaint leaves all of that a mystery.  And that is particularly problematic in this case where Plaintiff admits that Defendants did not have access to the backend of the RVa Software and only had access to the external-facing user interface.

The Supreme Court has rejected this use of mere conclusions and "formulaic recitation." *Iqbal*, 556 U.S. at 678.  The Seventh Circuit has decried plaintiffs' pointing to broad categories of information, as Plaintiff has done, and forcing "the court to hunt through the details in search of items meeting the statutory definition."  *IDX Sys. Corp. v. Epic Sys. Corp*., 285 F.3d 581, 584 (7th Cir. 2002); *see also Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) (plaintiff cannot state trade secret claim "by simply 'producing long lists of general areas of information which contain unidentified trade secrets'").  Likewise, this District has stated "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated."  *Thermal Zone Prod. Corp. v. Echo Eng., Ltd*., 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993) (quoting *Composite Marine*, 962 F.2d at 1266); *see also Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595 n.2 (7th Cir. 2001) ("[A] plaintiff must do more than direct the court to a broad area of technology and assert that something there must have been secret and

12

misappropriated.  The plaintiff must point to concrete secrets.").  In other words, plaintiffs must put defendants on notice of the *secretive* aspects of their proprietary information, rather than merely describing their products in general terms that could apply to any other similar product within the industry.  *See Smoketree Holding LLC v. Apke*, 2023 WL 6377272, at *2 (D. Ariz. Sept. 29, 2023) (plaintiff's description of its product as a "very specific way of identifying, buying, and selling land" did not amount to a "trade secret" because such description generally described an "essential part" of the real estate industry).

Where plaintiffs have failed to provide the specifics around the "trade secrets" purportedly misappropriated, courts – including this Court – have consistently dismissed trade secret claims. *See, e.g.*, *Smietana v. Stephens*, 2023 WL 3737720, at *11 (N.D. Ill. May 30, 2023) (Ellis, J.) (dismissing DTSA claim when plaintiffs alleged "that their trade secrets include 'hardware and software' and 'source code,' without alleging which pieces of hardware, software, or source code [they] allege[] constitute trade secrets"); *You Map, Inc. v. Snap. Inc.*, 2021 WL 106498, at *7–8 (D. Del. Jan. 12, 2021) (recommending dismissal of DTSA claim alleging misappropriation of trade secrets associated with software that baldly asserted it with no detail), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021); *Decurtis LLC v. Carnival Corp.*, 2021 WL 1968327, at *6–7 (S.D. Fla. Jan. 6, 2021) (holding that naming specific project "and then following it with categorical descriptions" such as "software," "prototypes," "database structures," "operations," "procedures," etc., "tells [defendant] nothing as to which trade secrets it misappropriated"), *report and recommendation adopted as modified*, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021).

Plaintiff's allegations in this case are similar to the allegations in *Creative Writer Software, LLC v. Schechter*, 2023 WL 6786796 (C.D. Cal. Sept. 6, 2023).  Plaintiff in that case developed a

browser-based software program that allowed writers to collaborate to create scripts, and licensed that software to one of the defendants. *Id.* at *1. After becoming a customer of the plaintiff, the defendant with the license and another defendant created a competing browser-based software program. *Id.* The plaintiff alleged that defendants misappropriated its trade secrets, including "proprietary information and schematics" and the "software's unique functionality." *Id.* at *3. The court dismissed the claim, finding that even though the complaint (unlike here) provided "detailed descriptions of the purpose, function and appearance of" the software, plaintiff failed to sufficiently identify what aspect of the software – such as the underlying source code, the functionality of the code, the design of the platform, or something else entirely – the defendants allegedly misappropriated. *Id.*

Here, the Complaint does not identify any aspect of the RVa Software it claims any Defendant misappropriated. At most (being generous *arguendo*), the Complaint has generically described the overall functionality of the RVa Software and claimed that the OptionsLive platform provides similar functionality. But just as that was not enough to put the defendants and the court on notice of the allegedly misappropriated trade secrets in *Shechter* (*id.*), Plaintiff's allegations concerning the "trade secrets" are insufficient here as well. *See also, e.g.*, *Principia Partners LLC v. Swap Fin. Grp.*, 2019 WL 4688711, *3–4 (S.D.N.Y. Sept. 26, 2019) (dismissing DTSA claim where court could not "discern" the "proprietary and confidential" part of software the defendant was alleged to have misappropriated); *WeInfuse, LLC v. InfuseFlow, LLC*, 2021 WL 1165132, at *3 (N.D. Tex. Mar. 26, 2021) (dismissing trade secret claim as too generic where plaintiff alleged misappropriation of trade secrets consisting of software architecture "behind a protected login," including "functionalities, user interface and display and design, interworkings of various

14

components and modules, logic flows, databases, and schema.").[5]

### 2. Plaintiff Fails to Adequately Allege That It Kept Secret Any Purported Trade Secrets to Which Defendants Had Access

As the Supreme Court has held, where "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). The Complaint runs head first into this principle through both its allegations and the documents to which they refer. *See supra* at n.2 & Exs. 1–7.

Recall that the premise of Plaintiff's misappropriation claims is that Defendants were able to access and then misappropriate some generic list of supposed trade secrets by using the external-facing graphical user interface of the RVa Software. Setting aside the implausibility of this premise, Plaintiff pleads itself into a problem. The user interface to the RVa Software platform is not something that Plaintiff held in strict confidence. Plaintiff's entire business model was to sell access to that user interface to as many companies as possible. (Compl. ¶ 49) Indeed, Plaintiff states it was successful in signing up "a number of brokers and hedge funds" to use the RVa Software. (*Id.* ¶ 52) Plaintiff can hardly claim that whatever supposed trade secrets were evident to all its customers from using its user interface were kept in the confidence required to maintain trade secret protection. *See Trizetto Grp.*, 819 F. Supp. 2d at 1028 (finding no trade secret when software is marketed to customer and reveals how the "program works, looks, [and] performs").

If Plaintiff were to point to its alleged contracts with third parties in an effort to claim that it took steps to maintain the confidentiality of its trade secrets, those allegations do not provide

---

[5] *See also, e.g.*, *Segerdahl*, 2018 WL 828062, at *3 (dismissing trade secret claims that were akin to "blanket generalizations" about plaintiff's product (quoting *Thermal Zone*, 1993 WL 358148, at *5); *Carpenter v. Aspen Search Advisers, LLC*, 2011 WL 1297733, at *3 (N.D. Ill. Apr. 5, 2011) (dismissing trade secret claims that, "while lengthy, provide[d] no specifics about the nature of the confidential data for which [plaintiff] claim[ed] trade secret protection").

15

Plaintiff the refuge that it seeks. (Compl. ¶¶ 49, 54–59) Notably, Plaintiff did not bring a breach

of contract claim or attach to the Complaint the contracts that it entered into with a different entity

– none of the Defendants is a signatory to those contracts. (*See* Exs. 1–7, License Agreements)

Those contracts were signed by "ED&F Man Capital Markets Limited," which was the defined

Licensee, and imposed confidentiality and use restrictions only on that entity, not any of the

Defendants in this case. (*Id.* at §§ 4, 10)

  This is no technicality. The law requires that the owner of information that it thinks is a

trade secret to take care to protect that information from discovery. Plaintiff did not do that here.

Instead, and knowing that the contracts only obligated non-party ED&F Man Capital Markets

Limited, Plaintiff freely provided login credentials to the RVa Software to Marex employees

without requiring them to acknowledge the confidentiality and use restrictions in the contracts or

sign a separate confidentiality agreement. (*Id.* ¶¶ 60, 78)

  The "failure to require those with access to [the] supposed trade secrets[, like Marex and

its employees,] to enter into non-disclosure and confidentiality agreements" has been recognized

by a court in this District as "among the most fundamental omissions by [a] company." *Abrasic*

*90 Inc.*, 364 F. Supp. 3d at 898. By not putting this or any other protection in place, any supposed

trade secret available from the user interface lost any protection it might have garnered. *See, e.g.*,

*Opus*, 2018 WL 1156246, at *3 (finding that storage of trade secrets on password-protected and

restricted network and confidentiality agreements were "normal business practices" that do no

establish protective measures beyond "those imposed for any other corporate information"

necessary for trade secret protection); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F.

Supp. 2d 846, 851 (N.D. Ill. 2011) ("While an agreement restricting the use of information may

be considered a reasonable step to maintain secrecy of a trade secret, such an agreement, without

more, is not enough." (internal citation and quotation marks omitted)); *Mut. Life Ins. Co. of New York v. Veselik*, 1998 WL 30672, at *6 (N.D. Ill. Jan. 23, 1998) (ordering dismissal where plaintiff did "not sufficiently allege[] that it made a reasonable effort to maintain [] secrecy and confidentiality" or aver any facts to indicate the information constituted a protectable trade secret).

### C. Plaintiff Does Not Adequately Allege Misappropriation

Plaintiff's inability to identify the supposed trade secrets Defendants purportedly accessed from the user interface also dooms the misappropriation element of Plaintiff's trade secret claims. To plead misappropriation, the Complaint must allege facts that demonstrate that Defendants acquired the supposed trade secrets through improper means or used the supposed trade secrets without Plaintiff's consent. 765 ILCS § 1065/2(b); 18 U.S.C. § 1839(5). The Complaint shows neither.

The misappropriation prong underscores the problem with the manner in which Plaintiff has identified the purported trade secrets at issue this case. Plaintiff cannot seriously be arguing that Defendants misappropriated more than twenty categories of trade secrets embedded in the RVa Software through accessing its customer-based, external-facing, user interface. Just as there is no way to tell from Plaintiff's Complaint what supposed trade secrets it claims, there is no way to tell which supposed trade secrets any Defendant accessed, and of those, any that were used. The absence of any specificity around the information that Plaintiff believes Defendants took and used in the OptionsLive platform makes it impossible to conclude not only that this information was a trade secret, but also that it was improperly used by any Defendant.

There also are no facts demonstrating that any Defendant used any of Plaintiff's supposed trade secrets. Every allegation in the Complaint about the purported use of trade secrets by Defendants is wholly conclusory. (Compl. ¶¶ 21, 31, 86–88, 116) Plaintiff alleges that Defendants built and launched a "competing software platform" that "offers substantially similar functionality

17

to the RVa Software," (*id.* ¶¶ 21, 114), but identifies no facts demonstrating use of any supposed trade secrets of Plaintiff. This is another fatal flaw to a misappropriation claim. *See, e.g.*, *Exceed Holdings*, 2018 WL 4757961, at *5–6 (holding that the alleged "similarities" of competing product were insufficient to support a misappropriation claim); *Knights Armament*, 568 F. Supp. 2d at 1376–77 (plaintiff's allegations that defendant's competing product was substantively similar to plaintiff's product were insufficient to support a misappropriation claim); *Brown*, 938 F. Supp. at 634 (allegations of "design similarities" between the parties' products were insufficient to support a misappropriation claim); *see also LiiON, LLC v. Vertiv Grp. Corp.*, 2021 WL 4963610, at *7 (N.D. Ill. Oct. 26, 2021) (granting summary judgment where plaintiff "point[ed] only to broad similarities between the two products," but did not "show that the allegedly similar features between the products . . . [were] actually attributable to [defendant]'s use of [plaintiff]'s alleged trade secrets."). Plaintiff's trade secret misappropriation claims fail.

**II.      The Court Should Dismiss Plaintiff's Claims for Improper Group Pleading**

Because Plaintiff is unable to identify what "trade secret" was accessed, let alone used, and when and by whom, perhaps it should be no surprise that Plaintiff makes no attempt to specify which Defendant it believes engaged in what purported misconduct. Plaintiff, instead, resorts to group pleading, making allegations against "Defendants" collectively, on 179 occasions.

The Complaint's assertions about the purported improper acquisition of trade secrets provide good examples:

- "*Defendants* decided to misuse their access to the RVa Software and RVa Platform";

- "*Defendants* deliberately hid the fact that they were developing a competing product (OptionsLive) from RVassets" and "led RVassets to believe that

18

Hoffman and Margiotta were part of the Marex brokerage team";

- "*Defendants* directly and/or through Lee and Aldridge improperly used their access to the RVa Software and RVa Platform to acquire RVassets trade secrets";

- "*Defendants* improperly used the RVa Software in a manner designed to probe its inner workings to glean information embodied in the RVa Software that RVassets maintains as trade secrets";

- "*Defendants* ran OptionsLive and the RVa Software in parallel to compare their respective outputs (e.g. the computed synthetic price) in order to, among other things, have OptionsLive more closely imitate the performance of the RVa Software"; and

-  "*Defendants* . . . solicited brokers . . . to request . . . information from RVassets under the guise of seeking customer service for client business."

(Compl. ¶¶ 74–75, 77, 84–85, 89, 98)

There is no way to tell from the collectively-pled "Defendants" who is alleged to have done what. The Complaint, for instance, does not allege any facts that Mr. Hoffman or Mr. Margiotta even accessed the RVa Software platform, let alone when and in what manner. Nor does the Complaint allege facts that Mr. Hoffman or Mr. Margiotta ever acquired any other information about the RVa Software platform, let alone when and in what manner. And the Complaint also lacks any allegations of fact that Mr. Hoffman or Mr. Margiotta ever used information about the RVa Software platform in connection with OptionsLive, let alone when and in what manner. The Complaint leaves everyone – including the Court – in the dark as to what specifically Plaintiff believes any Defendant did to allegedly misappropriate its purported trade secrets.

Plaintiff's collective pleading of allegations against all "Defendants" fails to satisfy the pleading standards under the Federal Rules. Under Rule 8, "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *Opus*, 2018 WL 1156246, at *3 ("[L]iability is personal," and as such, a plaintiff "must put each defendant on notice of their actions"). A complaint, like Plaintiff's, based on group pleading or "a theory of collective responsibility must be dismissed." *Knight*, 725 F.3d at 818; *see also Opus*, 2018 WL 1156246, at *2–3 (allegations that "all the individual defendants improperly acquired trade secrets from [plaintiff]" "fail[ed] to provide [] notice and, instead, [wa]s the kind of bare conclusions that fail the standard under *Iqbal*"); *Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017) (dismissing complaint because it did not distinguish between each defendant, and instead collectively referred to the individuals as "the defendants").

## III. The Court Should Dismiss Plaintiff's Remaining Claims (Counts 3 through 8)

Likely as an afterthought to its ITSA and DTSA claims (or perhaps to convey heft where substance is missing), Plaintiff asserts another six state law claims. These claims are for alleged tortious interference with an economic advantage (Count 3), purported violations of the Illinois Deceptive Trade Practices (Count 4), alleged unfair competition (Count 5), supposed common law fraud and fraudulent concealment (Counts 6–7), and assertions of unjust enrichment (Count 8). The Court should dismiss these claims because (a) they are preempted by the ITSA and (b) even if they were not, Plaintiff fails to otherwise adequately plead a claim as to each.

### A. Plaintiff's Remaining Claims Are Preempted by the ITSA

The ITSA contains an express preemption provision that is "intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS § 1065/8(a); *Spitz v. Proven Winners*

*N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (quoting ITSA). This provision prevents "attempts at bulking up a complaint by adding duplicative claims for relief." *Master Tech Prod., Inc. v. Prism Enters., Inc.*, 2002 WL 475192, at *3 (N.D. Ill. Mar. 27, 2002). Accordingly, ITSA preemption applies to claims that are "premised entirely on the misappropriation of a trade secret or related idea." *Christopher Glass & Aluminum, Inc. v. O'Keefe*, 2017 WL 2834536, at *4 (N.D. Ill. June 30, 2017). There can be no doubt that Plaintiff's remaining claims rest entirely on the alleged misappropriation and are preempted.

*Tortious Interference with Economic Advantage (Count 3)*. This claim asserts that Defendants intentionally interfered with current and prospective business relationships by "promoting and using OptionsLive" and "passing off OptionsLive as the RVa Software" by incorporating that software's trade secrets into OptionsLive. (Compl. ¶ 194) The purported tortious interference is premised entirely on the alleged misappropriation. Without the alleged misappropriation of a trade secret, there is no "wrongful conduct." The claim would read that Defendants promoted and used a product that did not contain any of Plaintiff's trade secrets and won the business of clients based on that product. As a result, the tortious interference claim should be dismissed. *See, e.g.*, *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, 2017 WL 4340123, at *5 (N.D. Ill. Sept. 29, 2017) (tortious interference claim preempted when plaintiff alleged that defendants "used [the] trade secrets and confidential information to target and poach [plaintiff's] current and prospective clients").

*Illinois Deceptive Trade Practices Act ("IDTPA") (Count 4).* This claim asserts that Defendants violated the IDTPA by "passing off the RVa Software as their own and/or passing off the use of OptionsLive as the RVa Software." (Compl. ¶ 204) This claim is again entirely based on the alleged misappropriation. The claim depends on the incorporation of Plaintiff's alleged

21

trade secrets into OptionsLive platform: Plaintiff is only able to imply that Marex's marketing and use of its OptionsLive platform conveyed an association with the RVa Software by assuming that the OptionsLive platform is the same thing as the RVa Software. Without the incorporation of the alleged trade secrets into the OptionsLive platform, Plaintiff could not claim that the marketing and use of that platform communicated anything about the RVa Software and would not have a claim. The IDTPA claim is, therefore, preempted. *See Seaga Mfg., Inc. v. Fortune Metal, Inc.*, 2001 WL 1196184, at *2 (N.D. Ill. Oct. 10, 2001) (deceptive trade practices claim preempted when "premised on the theory that [defendant] misappropriated [plaintiff]'s trade secrets").

**Unfair Competition (Count 5)**. This claim is based on the exact same allegations as the tortious interference claim and an assertion that Defendants "misappropriated (and continue to misappropriate) RVassets's trade secrets." (Compl. ¶ 219) There can be no doubt that this claim is preempted. *See W. Union Co. v. Kula*, 2017 WL 11562395, at *3 (N.D. Ill. June 13, 2017) (unfair competition claim "futile because [it was], in effect, [a] common law trade secret misappropriation claim[]" preempted by the ITSA).

**Fraud and Fraudulent Concealment (Counts 6-7).** These claims allege that Defendants made unspecified misrepresentations and omissions about their use of the RVa Software to facilitate the purported misappropriation of Plaintiff's alleged trade secrets. (Compl. ¶¶ 230, 241–43) These allegations, of course, revolve around and are dependent on the alleged misappropriation. If there were no alleged misappropriation, there would be no reason to suggest that Defendants' statements about its use of the platform were misleading. The fraud claims are preempted. *See, e.g.*, *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 270 (N.D. Ill. 2020) (fraud claim based on improper "sharing [of] login credentials" to individuals who developed competing software was not distinct from misappropriation claim); *Woodard v.*

22

*Harrison*, 2008 WL 4724370, at *4 (C.D. Ill. Oct. 24, 2008) (ITSA preempted fraud claim that alleged that defendants acquired trade secrets based on misrepresentation and fraud); *Master Tech*, 2002 WL 475192, at *3 (finding ITSA preempted fraud claim); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000) (plaintiff "add[ed] nothing more to its ITSA claim by alleging that defendants lied about misappropriating a trade secret").

**Unjust Enrichment (Count 8)**.  This claim alleges that "Defendants received monetary value, revenue, and profit as a result of fraudulently obtaining, using, and analyzing the RVa Software and/or the Trade Secrets."  (Compl. ¶ 253)  This claim, like the others, is clearly preempted.  *See, e.g.*, *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (Ill. App. Ct. 1998) (unjust enrichment claim preempted); *Spitz*, 759 F.3d at 733 (same).

### B.   Even if Plaintiff's Remaining Claims Were Not Preempted, the Complaint Fails to Adequately Plead Them

Plaintiff's remaining claims fail for another reason:  the Complaint fails to plead essential elements of those claims.  Plaintiff has not stated a claim, and they all must be dismissed.

### 1.   Plaintiff Fails to Plead a Tortious Interference or Unfair Competition Claim (Counts 3 & 5)

To state a claim for tortious interference or unfair competition, Plaintiff must plead, among other things, (1) a "reasonable expectation of future business with a third party" and (2) Defendants' "purposeful interference to prevent the expectancy from being fulfilled."  *DSC Logistics, Inc. v. Innovative Movements, Inc.*, 2004 WL 421977, at *2 (N.D. Ill. Feb. 17, 2004) (tortious interference); *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 341 (N.D. Ill. 2020) ("Illinois courts require a plaintiff to plead and prove every element of a claim for tortious interference with prospective economic advantage" for an unfair competition claim).  Plaintiff has not adequately pled either element to state a claim against any Defendant.

First, Plaintiff fails to allege that it had a reasonable expectancy of future business with a

third party.  The Complaint makes the conclusory assertion that Plaintiff "had a reasonable expectation of entering into a valid business relationship and/or doing continuing business and receiving ongoing revenue from new and existing customers, including the U.S. based hedge fund." (Compl. ¶ 192)  But Plaintiff fails to allege any facts to support a reasonable expectation. The only third party that Plaintiff identifies is a "U.S.-based hedge fund," which contracted to use the RVa Software from 2019 to 2020.  (*Id.* ¶¶ 136–41)  Plaintiff asserts that the launch of OptionsLive caused that hedge fund to stop contracting with Plaintiff and impeded Plaintiff's expected future business relationship with that hedge fund. (*Id.* ¶¶ 140–41)  But Plaintiff does not substantiate its claim that it had an expectation of a future relationship with the hedge fund. Plaintiff, for example, does not (and cannot) allege that it had the only trading platform that this hedge fund could use, nor plead any facts that establish that the hedge fund would have renewed its contract with Plaintiff.  Courts have found that where, as here, a plaintiff only pleads a prior contractual relationship with a third party, this fails to "establish a reasonable expectation of [plaintiff]'s entering into any particular future business relationship." *See Int'l Serv. Assocs., Inc. v. Arco Mgmt. of Washington, D.C., Inc.*, 1994 WL 583302, at *7 (N.D. Ill. Oct. 21, 1994).  This is because a "reasonable expectancy requires more than the hope or opportunity of a future business relationship." *Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 556 (N.D. Ill. 2022) (internal quotation marks and citation omitted).

Second, Plaintiff fails to allege that Defendants purposely interfered with any business expectancy.  Plaintiff claims that Defendants interfered with its expectation of a future business relationship with the U.S.-based hedge fund by inducing that hedge fund to terminate its relationship with Plaintiff. (Compl. ¶¶ 140–41)  But "[t]o establish inducement, Plaintiff[] must show active persuasion, encouragement or incitement that goes beyond merely providing

information in a passive way." *Sain v. Nagel*, 997 F. Supp. 1002, 1018 (N.D. Ill. 1998). That is entirely missing from the Complaint. All Plaintiff alleges is that Defendants induced the hedge fund to terminate its business relationship by "promot[ing] OptionsLive." (Compl. ¶ 140) This does not show any actual communication by Defendants with the U.S. hedge fund, let alone show active persuasion, as required.

Even if Plaintiff had pled active persuasion, the Complaint would still fail to allege *purposeful* interference by Defendants. Plaintiff must not only show that Defendants succeeded in ending a business relationship, it must also show that each did so through improper means and with actual malice. *See Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998); *Marc Dev., Inc. v. Wolin*, 845 F. Supp. 547, 555 (N.D. Ill. 1993), *reconsideration granted*, 1993 WL 498214 (N.D. Ill. Dec. 1, 1993) (relevant portion unaffected). The Complaint is nowhere close to doing that.

The insufficiency of the Complaint's tortious interference and unfair competition claims is particularly stark when viewed through the lens of Mr. Hoffman or Mr. Margiotta. There is a complete absence of facts demonstrating that Mr. Hoffman or Mr. Margiotta even knew about the U.S.-based hedge fund that supposedly terminated its relationship with Plaintiff, much less had anything to do with any purported inference. The lack of these facts is fatal. *See Zummo v. City of Chicago*, 345 F. Supp. 3d 995, 1009 (N.D. Ill. 2018), *aff'd*, 798 F. App'x 32 (7th Cir. 2020) (dismissing tortious interference with economic advantage claim where plaintiff did "not state any facts suggesting that the [defendant] knew of that sort of [business] expectancy[ or] that the [defendant] purposefully interfered with such a relationship").

### 2. Plaintiff Fails to Plead an IDPTA Claim (Count 4)

To state an IDTPA claim, Plaintiff must allege "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) the deception occurred in the

course of conduct involving trade and commerce." *Vincent v. City of Chicago*, 2005 WL 818410, at *4 (N.D. Ill. Apr. 6, 2005). Plaintiff has not met these requirements.

The purported deceptive act of Defendants was leading an unspecified party to believe either that Defendants owned RVa Software or that OptionsLive was the same as RVa Software. (Compl. ¶¶ 203–05) Even assuming that Defendants engaged in these purported deceptive acts (which the Complaint does not allege), the IDPTA claim would still fail. This is because an IDPTA claim requires plaintiff to demonstrate that defendant directed its deceptive acts at plaintiff and intended for plaintiff to rely on these deceptive acts. *See Vincent*, 2005 WL 818410, at *4 (plaintiff failed to "indicate [defendant] intended for [plaintiff] to rely on the deception"); *Wobble Light, Inc. v. McLain/Smigiel P'ship*, 890 F. Supp. 721, 726 (N.D. Ill. 1995) (dismissing IDTPA claim where the "complaint [could] only be read to allege that the defendants intended to deceive the public about the origin of [plaintiff's product] and not that defendants intended to deceive [plaintiff]"). The alleged deceptive acts in the Complaint were not directed at Plaintiff – they were allegedly directed at an unspecified party – and there are no facts demonstrating that any Defendant intended Plaintiff to rely on these purported deceptive acts. Indeed, it would make no sense to claim that Defendants intended Plaintiff to rely on the alleged deceptive acts because Plaintiff knows full-well that Defendants do not own the RVa Software and that OptionsLive is not the RVa Software.

Again, the absence of allegations to support an IDPTA claim is on full display with respect to Mr. Hoffman or Mr. Margiotta. Read most charitably, the only reasonable inference in the Complaint is that one or both of them played a role in developing the OptionsLive software. But there are no factual allegations supporting the inference that Mr. Hoffman or Mr. Margiotta in particular played a role in any purported deception of anyone. Nor does the Complaint allege facts

26

demonstrating that Mr. Hoffman or Mr. Margiotta were involved in any marketing of OptionsLive. Without active control over the allegedly deceptive acts, liability cannot attach. *See Free Green Can, LLC v. Green Recycling Enterprises, LLC*, 2011 WL 5130359, at \*5 (N.D. Ill. Oct. 27, 2011) ("[T]he complaint must contain allegations showing the officers' active participation in, or the exercise of specific control over the wrongful acts.").

### 3. Plaintiff Fails to Plead a Fraud or Fraudulent Concealment Claim (Counts 6 & 7)

To state a fraud claim, Plaintiff must plead "(1) a false statement of material fact; (2) knowledge or belief by the maker that the statement was false; (3) an intent to induce reliance on the statement; (4) reasonable reliance upon the truth of the statement; and (5) damages resulting from that reliance." *Sweeney v. Forrest Redi-Mix Inc.*, 2009 WL 10742115, at \*1 (N.D. Ill. Oct. 29, 2009). For a fraudulent concealment claim, Plaintiff must allege not only the basic elements of fraud but also that Defendants "concealed a material fact when . . . under a duty to disclose that fact to plaintiff." *Smith v. Duffey*, 2008 WL 4874088, at \*2 (N.D. Ill. June 23, 2008), *aff'd*, 576 F.3d 336 (7th Cir. 2009). In pleading either type of fraud claim, Plaintiff must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and "allege fraud with 'particularity.'" *Squires-Cannon*, 897 F.3d at 805. This requires Plaintiff to "describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks omitted).

Plaintiff fails to meet the heightened pleading standards for fraud. Plaintiff's assertions of fraud amount to claiming that Defendants (or any of them, it cannot be discerned): (a) "falsely represented to RVassets [their] intended use of the RVa Software"; (b) "falsely represented" that a number of "economically insignificant and/or unexecuted trades . . . resulted from genuine client business"; and (c) and "fail[ed] to disclose the true role of Hoffman and Margiotta at Marex."

27

(Compl. ¶¶ 229, 242)  But the Complaint does not allege the particulars of these supposed frauds. There is no indication, for example, of who made the alleged misrepresentations or omissions, to whom they did so, when they did so, where the alleged misrepresentations or omissions were made, or the means by which the misrepresentations or omissions.  The lack of specific details about the supposed frauds is grounds for dismissal of both fraud claims.  *See, e.g.*, *Aetna Life Ins. Co. v. Youtzy*, 1991 WL 160404, at *5 (N.D. Ill. Aug. 15, 1991) (dismissing fraud claim where plaintiff made "no specific allegations regarding the time, place and context of the alleged [mis]communications"); *Forker v. Matanky*, 1991 WL 14067, at *1 (N.D. Ill. Feb. 1, 1991) (same).

Plaintiff's fraudulent concealment claim also fails because Plaintiff has not demonstrated that any Defendant owed a duty of disclosure to it.  While Plaintiff makes the conclusory statement that Defendants "had a duty to disclose" certain information via a purported "fiduciary relationship" and "relationship of trust and confidence," (Compl. ¶ 240), it does not plead any facts to establish such relationship.  Plaintiff was a vendor and Marex was just one of its customers. And Mr. Hoffman and Mr. Margiotta were employees with no relationship with Plaintiff. Plaintiff's conclusory statements fail the standards for pleading.

### 4.    Plaintiff Fails to Plead an Unjust Enrichment Claim (Count 8)

In Illinois, unjust enrichment is not a separate cause of action that, standing alone, justifies an action for recovery.  *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 834 (N.D. Ill. 2009).  Rather, "it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct."  *Id.*  And where it is alleged as part of a tort elsewhere being pled, a plaintiff must allege the following (in addition to what that tort otherwise requires): "(1) an enrichment, (2) an impoverishment; (3) a relation between the enrichment and impoverishment,

(4) the absence of justification and (5) the absence of a remedy provided by law." *Tucker v. Charles Schwab Bank*, 2013 WL 1337329, at *5 (N.D. Ill. Mar. 29, 2013).

Plaintiff here bases its alleged unjust enrichment on the trade secret misappropriation claim.  (Compl. ¶ 253 (stating that Defendants were enrichment as "a result of fraudulently obtaining, using, and analyzing the RVa Software and/or the Trade Secrets"))  Because Plaintiff fails to plead a trade secret misappropriation claim, its unjust enrichment claim fails.  *See Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]hen the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment . . . is no longer viable." (emphasis in original)); *RMB Fasteners, Ltd. v. Heads & Threads Int'l, LLC*, 2012 WL 401490, at *13 (N.D. Ill. Feb. 7, 2012) ("Because Plaintiff's particular theory of unjust enrichment is based on the alleged scheme to defraud . . . , the unjust enrichment claim fails along with those claims."); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*, 2010 WL 624709, at *8 (N.D. Ill. Feb. 18, 2010), *aff'd*, 631 F.3d 436 (7th Cir. 2011) (dismissing plaintiff's unjust enrichment claim "couched in terms of consumer fraud" because plaintiff "fail[ed] to state a claim of consumer fraud").

Plaintiff's claim against Mr. Hoffman and Mr. Margiotta fails for the additional reason that Plaintiff has not alleged that either was actually enriched by the supposed wrongdoing.  *See Tucker*, 2013 WL 1337329, at *5.  Plaintiff alleges that they contributed to the development of OptionsLive.  (*See* Compl. ¶ 72)  But even if the development of OptionsLive were wrongful (which the Complaint does not show, and it was not), the Complaint lacks any allegations that Mr. Hoffman or Mr. Margiotta were enriched in any way.  Without such allegations, the unjust enrichment claim fails.

29

## CONCLUSION

The series of deficiencies in the Complaint demonstrated *passim*, each of which independently requires dismissal, are fatal flaws that cannot be fixed by repleading.  There are no facts to support Plaintiff's claims, and Plaintiff cannot in good faith allege otherwise.  Thus, Defendants respectfully request that the Court grant their motion and dismiss all of Plaintiff's claims, and to do so with prejudice.

 Dated: December 11, 2023

Respectfully submitted,

/s/ Stacie R. Hartman

Stacie R. Hartman (IL Bar No. 6237265)
John J. Byron (IL Bar No. 6334732)
(*application for admission forthcoming*)
Alexander S. Lewis (IL Bar No. 6344752)
Daniel Gelwicks (IL Bar No. 6320663)
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1258
Fax: (312) 577-1370
shartman@steptoe.com

**Attorneys for Defendants**

# EXHIBIT E



**E D & F Man Services Inc.**

April 14, 2021

Mr. David Hoffman
15 Hillside Avenue
Short Hills, NJ 07078

Dear Mr. Hoffman:

Reference is hereby made to that Employment Agreement dated February 12, 2019 by and between E D & F Man Services Inc. (the "Company") and you, a copy of which is attached hereto as Exhibit A (the "Employment Agreement") and the October 6, 2020 amendment to the Employment Agreement, a copy of which is attached hereto as Exhibit B (the "Amendment"). Capitalized terms utilized and not defined herein shall have the meaning ascribed to them in the Employment Agreement. Effective as of the date hereof (the "Effective Date"), the Company and you hereby wish to further amend the Employment Agreement and the Amendment as follows (this "2nd Amendment"):

1.    OptionsLive is an Invention developed subsequent to the Commencement Date. All IPRs subsisting in any Inventions developed subsequent to the Commencement Date shall be the exclusive property of Company and you irrevocably and unconditionally waived in favor of Company, its licensees and successors in title, all current and future moral rights (or similar rights existing in any part of the world) which you may have in respect of any Inventions.

2.    Notwithstanding the above, Company has agreed to provide as follows in connection with OptionsLive:

      To the extent OptionsLive and its IPRs are sold by the Company or any of its affiliates to a third-party, you shall be entitled to ten percent (10%) of the gross proceeds from such sale (the "10% of Sale Proceeds").

3.   The first sentence of subsection (b) under Other Compensation in Section "**4. Compensation**" on page 2 of the Employment Agreement is hereby deleted in its entirety and replaced as follows:

   "Employee shall be entitled to receive a Quarterly Payment according to the calculations set out at Schedule 1 and Schedule 2 as aggregated, less all taxes, standard employee contribution deductions and any deductions required by law, payable forty-five (45) days in arrears ("Quarterly Payment")."

4.   The following sentence shall be added at the end of subsection (b) under Other Compensation in Section "**4. Compensation**" on page 2 of the Employment Agreement:

   "To the extent the aggregate of the Quarterly Payments calculated in accordance with Schedules 1 and 2 results in a deficit, such deficit shall be carried forward to the calculation for the next quarter and, if necessary, subsequent quarters."

5.   Schedule 1 of the Employment Agreement is hereby amended by adding the following sentence:

   "In no event shall the calculation of *Performance Compensation* include revenue from OptionsLive."

6.   New Schedule 2 attached hereto as Exhibit C is hereby added to the Employment Agreement.

7.   Except as specifically amended herein, the remainder of the Employment Agreement and the Amendment shall remain in full force and effect. All references to the Employment Agreement and the Amendment shall be deemed to mean the Employment Agreement and the Amendment as modified herein. This 2nd Amendment shall not constitute a novation of the Employment Agreement and the Amendment but shall constitute an amendment thereof. The parties hereto agree to be bound by the terms and conditions of the Employment Agreement, as amended by the Amendment and this 2nd Amendment, as though such terms and conditions were set forth therein.

Please acknowledge your agreement with the above by signing below.

Very truly yours,

Phil Lyons
Senior HR Business Partner

**ACKNOWLEDGED AND AGREED:**

David Hoffman

4/14/2021

Dated

# EXHIBIT F

**ED&F MAN** | **Capital Markets**                    **E D & F Man Capital Markets Inc.**

EST. 1783

**VIA ELECTRONIC MAIL ONLY (D.HOFFMAN@ME.COM)**

June 20, 2022

Mr. David Hoffman
15 Hillside Avenue
Short Hills, New Jersey 07078

Dear Mr. Hoffman:

Reference is hereby made to that Employment Agreement dated February 12, 2019, by and between E D & F Man Services Inc. (the "Company") and you (the "Agreement"), the October 6, 2020, amendment to the Employment Agreement (the "Amendment"), and the April 14, 2021, amendment to the Employment Agreement (the "2nd Amendment") (the Agreement, the Amendment and the 2nd Amendment shall collectively be referred to as the "Employment Agreement"). Capitalized terms utilized and not defined herein shall have the meaning ascribed to them in the Employment Agreement.

The Employment Agreement requires either Party to provide thirty (30) days' prior written notice of termination (the "Notice Period"). Notwithstanding the requirement of the Notice Period, the Company and you mutually agreed that your last day of employment with the Company would be June 15, 2022 (the "Termination Date").

This letter will serve as a reminder of your post-employment obligations and restrictions. Following the Termination Date, you shall be subject to the following post-employment restrictions:

(a)     **for a period of three (3) months after the Termination Date (the "Non-Competition Period")**, you shall not compete with the business of the Business or Company by being directly or indirectly employed or engaged in any capacity by any person, firm or company which engages in or provides Restricted Business to Restricted Customers or Prospective Customers (the "Non-Competition Obligations");

(b)     **for a period of six (6) months after the Termination Date**, you shall not, either on your own account or for any person, firm or company directly or indirectly have any dealings or transact business in relation to Restricted Business with any Restricted Customer or Prospective Customer of the Business, Company or Group Company;

(c)     **for a period of six (6) months after the Termination Date**, you shall not, either on your own account or for any person, firm or company, directly or indirectly in relation to the supply of Restricted Business solicit or endeavor to solicit or entice the business or customer of any Restricted Customer or Prospective Customer; and

(d)     **for a period of twelve (12) months after the Termination Date**, you shall not, either on your own account or for any person, firm or company, directly or indirectly solicit or entice away or endeavor to solicit or entice away any

director or employee of the Business, Company or any Group Company ("Non-Solicit Obligations").

(a), (b) & (c) shall be collectively referred to as the "Post-Employment Restrictions".

The post-employment restrictions do not prevent you from providing services pursuant to the REDACTED REDACTED by and between the Company and Miliardi Capital LLC dated REDACTED REDACTED    In addition, please note that you are under an obligation to maintain the confidentiality of the Company's Confidential Information (see Section 9 of the Employment Agreement) and that you are further obligated to return to the Company any Confidential Information in your possession (see Section 7 of the Employment Agreement).

In the 2nd Amendment, there was a reference to OptionsLive, an Invention developed subsequent to the Commencement Date.   All IPRs subsisting in any Inventions developed subsequent to the Commencement Date shall be the exclusive property of Company and you irrevocably and unconditionally waived in favor of Company, its licensees and successors in title, all current and future moral rights (or similar rights existing in any part of the world) which you may have in respect of any Inventions.  The Company further agreed in the 2nd Amendment that to the extent OptionsLive and its IPRs are sold by the Company or any of its affiliates as of the date hereof to a third-party, you shall be entitled to ten percent (10%) of the gross proceeds from such sale (the "10% of Sale Proceeds").  The Company has agreed that the 10% of Sale Proceeds shall remain in full force and effect subsequent to the Termination Date.  Furthermore, subsequent to the Termination Date, the Company: (i) shall permit you to be referenced as OptionsLive co-founder so long as the Company or one of its affiliates as of the date hereof owns OptionsLive and its IPRs and only during the term of the REDACTED and (ii) to the extent OptionsLive is sold by the Company or any of its affiliates as of the date hereof to a third-party, the Company shall request as part of such sale that the buyer offer you an executive role and a board seat.

All post-employment obligations or restrictions contained in the Employment Agreement, including the Post-Employment Restrictions and the Non-Solicit Obligations, shall continue notwithstanding the termination of the employment relationship between the Company and you.

Very truly yours,

Phil Lyons
Senior HR Business Partner, Capital Markets

**ACKNOWLEDGED AND AGREED:**

_David Hoffman_      6/21 , 2022
David Hoffman          Date

# EXHIBIT G

Exhibits

**Table of Contents**

As filed with the Securities and Exchange Commission on April 15, 2024.

Registration No. 333-278231

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Amendment No. 1
## to
## FORM F-1
## REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# Marex Group plc

(Exact Name of Registrant as Specified in its Charter)

**Not Applicable**

(Translation of Registrant's Name into English)

| | | |
|---|---|---|
| **England and Wales** | **6200** | **Not Applicable** |
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**155 Bishopsgate**
**London EC2M 3TQ**
**United Kingdom**
**+44 2076 556000**

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

**Marex Capital Markets Inc.**
**140 East 45th Street, 10th Floor**
**New York, New York 10017**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | | |
|---|---|---|
| **Marc D. Jaffe** | **Thomas N. O'Neill III** | **Christian O. Nagler** |
| **Ian D. Schuman** | **Dinesh D. Banani** | **Zoey Hitzert** |
| **Jennifer M. Gascoyne** | **Herbert Smith Freehills LLP** | **Kirkland & Ellis LLP** |
| **Latham & Watkins LLP** | **Exchange House** | **601 Lexington Avenue** |
| **1271 Avenue of the Americas** | **Primrose Street** | **New York, New York 10022** |
| **New York, New York 10020** | **London EC2A 2EG** | **(212) 446-4800** |
| **(212) 906-1200** | **United Kingdom** | |
| | **+44 (0)20 7374 8000** | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the

Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933. Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

†      The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the U.S. Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

into the European Union, as compared to 21% and 17%, respectively, for 2022. Following the introduction of sanctions on Russian oil and coal exports, the price of oil, gas and coal increased. Given Ukraine is a large producer of grain for global markets, the disruption of trade flows caused by the Russian invasion also significantly impacted activity in the agricultural markets.

Russia's invasion of Ukraine also disrupted metal production, including nickel, palladium and raw aluminum, leading to price increases across all three commodities. Nickel market prices doubled to more than $100,000 per ton on March 8, 2022, which led the LME to temporarily suspend trading in nickel. This significant increase in volatility resulted in increased client activity and higher revenue in our Market Making and Clearing businesses, particularly in the first half of 2022.

A reduction in the production or availability, or increase in the cost, of relevant commodities (or a market perception that changes with respect to these factors has or may become likely) generally results in increased volatility. In the short term, higher volatility generally leads to an increase in commodities trading volumes and commissions for our business. However, if geopolitical developments impact production or the availability of a relevant commodity for an extended period, trading volumes may be reduced. Lower volumes of associated economic activity could also adversely impact our financial performance. The impact of any significant increase in volatility or disruption in commodity markets is seen most notably in our Market Making business. For example, trading volumes in our Market Making business increased approximately 30% year-on-year in 2022, with higher levels of client activity in both energy and metals markets caused by Russia's invasion of Ukraine and the nickel market as described above, which more than offset lower trading volumes in the agricultural markets due to supply disruptions, resulting in our Market Making revenue increasing by 22% year-on-year in 2022.

There are generally fewer providers of liquidity during periods of volatility, which leads to wider bid-offer spreads and increased commodity hedging. These conditions present us with an opportunity to increase our trading volumes and revenue in our Market Making business. In Clearing, increased client trading volumes generally translate to higher commission revenue.

### *Expansion and Consolidation through Acquisitions and Investments in New Capabilities*

We have expanded our business substantially through acquisitions and investments in new capabilities. As a result, we have extended both our product coverage and geographic footprint and substantially increased the scale and scope of our business.

Our acquisition of ED&F Man Capital Markets provided the following benefits to our business:
- substantially expanded our geographic exposure in North America, APAC and the Middle East;
- increased the size of our client base (our client balances (including segregated and non-segregated client balances) grew by 83% from $8.0 billion as of June 30, 2022 to $14.6 billion as of December 31, 2022, primarily as a result of the acquisition of ED&F Man Capital Markets) and contributed in part to a significant increase in our net interest income for the year ended December 31, 2023; and
- expanded our clearing, agency and execution capabilities in financial securities, including equities, fixed income and foreign exchange.

The acquisition of the brokerage business of OTCex in February 2023 further strengthened our capabilities in equities, fixed income products and commodities and expanded our operational capabilities in Europe and the Middle East.

Our revenue increased by 75.0% to $1,244.6 million for the year ended December 31, 2023 from $711.1 million for the year ended December 31, 2022. Our performance also benefited from the

92

Table of Contents

contribution of ED&F Man Capital Markets acquisition in the fourth quarter of 2022. Our profit after tax increased by 43.9% to $141.3 million for the year ended December 31, 2023 from $98.2 million for the year ended December 31, 2022, and our Adjusted Operating Profit increased by 89.0% to $230.0 million from $121.7 million for the same periods. In addition to ED&F Man Capital Markets and the brokerage business of OTCex, which we acquired in 2023, we have completed selected acquisitions of varying sizes. See "*Business – Our Strategic Acquisitions.*"

We also have expanded and diversified our business through investments in new capabilities, increasing the number of front-office employees through strategic hires and expanding the range of products and asset classes in which we can service our clients. In particular, we developed our Market Making business by adding recycled metals capabilities and carbon offsets to our renewables product offering, and in our Hedging and Investment Solutions business, we have continued to invest in our derivatives engine and client portal.

These acquisitions and investments in new capabilities have materially increased our geographical footprint and product coverage in recent years and further diversified our business. As a result, it may be difficult to compare certain periods of growth against our prior and future periods. We anticipate pursuing a similar strategy in future periods to further expand our business through additional acquisitions and investments in new capabilities.

### *Industry Competition and Employee Compensation*

The success of our business depends upon our ability to offer competitive products and services, which is underpinned by having a strong employee base, including front-office staff, who help to provide our competitive products and services to our growing client base.

Front-office staff play an important role in acquiring and retaining trading business from clients. We compete with other interdealer brokers for front-office staff who have key counterparty relationships and relevant market knowledge. The average number of our front-office FTE increased to 1,028 as of December 31, 2023 from 695 and 615 as of December 31, 2022 and 2021, respectively, as we expanded our business through both acquisitions and organic growth.

The majority of our cost base is headcount-related compensation and benefits, a significant proportion of which is variable and can flex with revenue. Overall, in 2023, approximately 47% of our cost base was fixed and approximately 53% was variable. In 2023, our costs were split approximately 70% and 30% between front-office and control and support, respectively. The graphic below presents our average FTE breakdown between the front-office and control and support for each period presented.

Table of Contents

*Year Ended December 31, 2023 Compared to Year Ended December 31, 2022*

*Net Commission Income*

Net commission income increased by 100% to $704.9 million for the year ended December 31, 2023 from $351.8 million for the year ended December 31, 2022. The increase was primarily driven by increased customer activity in Agency and Execution, as well as in our Clearing business.

In our Agency and Execution business, net commission income increased by 129% to $473.4 million in 2023 from $207.1 million in 2022, primarily due to a $186.3 million increase in Financial Securities, reflecting the ED&F Man Capital Markets and OTCex acquisitions, both of which significantly increased our capabilities in equities, fixed income, rates and FX markets as well as $79.3 million growth in Energy due to increased activity levels and higher productivity per employee. At the same time, in our Clearing business, net commission income increased by 63% to $236.2 million in 2023 from $144.7 million in 2022, due to increased client activity on our platform compared to the prior period, as a result of the larger client base from the ED&F Man Capital Markets acquisition, which drove a $77.2 million increase, and clients in our existing businesses, which led to a $14.3 million increase.

*Net Trading Income*

Net trading income increased by 27% to $411.4 million for the year ended December 31, 2023 from $325.3 million for the year ended December 31, 2022. The increase was primarily led by $43.7 million growth in Agency and Execution, driven by our Financial Securities business and a $36.9 million increase in Hedging and Investment Solutions reflecting increased demand.

In Market Making, net trading income increased by 2% in 2023. We experienced strong acquisition driven growth in financial securities products, which grew by 123% to $25.6 million. However, this was partly offset by lower net trading income from the metals, agriculture and energy markets, which decreased by $10.5 million, $1.8 million and $20.5 million, respectively, reflecting lower levels of volatility and client activity due to a return to more normal levels following the exceptional conditions seen in the first half of 2022.

*Net Interest Income*

Interest income increased by 204% to $591.8 million for the year ended December 31, 2023 from $194.4 million for the year ended December 31, 2022. Interest expense increased by 185% to $470.2 million for the year ended December 31, 2023 from $165.0 million for the year ended December 31, 2022. This growth was driven by both increases in interest rates and average balances. During 2023, the average Fed Funds rate increased to 5.0% for the year ended December 31, 2023 from 1.7% in 2022. In addition to the rise in interest rates, we experienced increases in our total average balances, which increased to $13.2 billion for the year ended December 31, 2023 from $9.1 billion for the year ended December 31, 2022 and $4.7 billion for the year ended December 31, 2021. Average balances grew due to a combination of increased activity levels within our core businesses, higher margin requirements at exchanges in the first half of 2023, as well as the full year impact of the acquisition of ED&F Man Capital Markets. As a result of these increases in interest rates and total client balances, our net interest income increased to $121.6 million for the year ended December 31, 2023 from $29.4 million net interest income for the year ended December 31, 2022.

*Net Physical Commodities Income*

Table of Contents

year increase in salary and wage costs due to pay raises, a 16.9% year over year increase in average headcount, particularly in our Control and Support segment, and an increase in share-based compensation as more staff were included in our incentive plan scheme. Our average FTEs increased to 1,241 for the year ended December 31, 2022 from 1,062 for the year ended December 31, 2021.

Depreciation and amortization

Depreciation and amortization expense increased by 34% to $13.8 million for the year ended December 31, 2022 from $10.3 million for the year ended December 31, 2021. The increase was primarily due to the depreciation and amortization of assets acquired during 2022, mainly right of use assets and property, plant and equipment acquired as a result of business combinations.

Other expenses

Other expenses increased by 43% to $147.8 million for the year ended December 31, 2022 from $103.5 million for the year ended December 31, 2021. This increase was primarily due to an increase in non-trading technology and support costs, trading systems and market data costs due to updates and enhancements to IT systems. Further, professional fees increased due to activities related to acquisitions.

Impairment of goodwill

Impairment of goodwill increased to a loss of $53.9 million for the year ended December 31, 2022, which was primarily due to an impairment charge within our OTC energy business that was recognized due to the combination of market conditions and increased discount rates.

Provision for credit losses

Provision for credit losses increased to $9.5 million for the year ended December 31, 2022 from $0.8 million for the year ended December 31, 2021. The increase was primarily due to the recognition of impairment losses on amounts due from two clients unable to cover margin calls during the period.

*Bargain Purchase Gain on Acquisitions*

Bargain purchase gain on acquisitions increased to $71.6 million for the year ended December 31, 2022. The acquisition of ED&F Man Capital Markets resulted in a gain due to the desire of the seller to exit the capital markets business segment. The lack of other companies that could acquire the business allowed us to obtain an acquisition price that was at a material discount to the tangible net asset value of the acquired business.

*Other Income*

Other income increased by 47% to $2.8 million for the year ended December 31, 2022 from $1.9 million for the year ended December 31, 2021. The increase was primarily due to a research and development expenditure credit from HMRC, which was identified after a full review and resulted in a $1.2 million taxable credit to the income statement.

Table of Contents

biofuels. Furthermore, the recycled metals market is forecast to continue growing at a rate of approximately 8% annually according to Maximize Market Research, and Shell/BCG reports that the carbon credits market is expected to continue growing at an annual rate of approximately 20%. We currently offer: emissions and biofuels and biogas products in all of our core businesses; renewable power in our Clearing, Market Making and Agency and Execution segments; and recycled metals in our Market Making segment. In addition to the environment-related products we currently offer, we believe there is a significant opportunity to develop bespoke "green" contracts, pairing carbon offsets with underlying commodities, as well as other sustainable product sets. Revenue derived from environmental products increased to $46.7 million for the year ended December 31, 2023 from $26.7 million and $22.7 million for the years ended December 31, 2022 and 2021, respectively. We announced in July 2023 that we had acquired GMN, a recycled metals market maker based in Hong Kong. By investing to expand green product coverage, we believe that we are well positioned to support our clients in delivering on their sustainability commitments and transitioning to a low carbon economy.

The acquisition of ED&F Man Capital Markets significantly increased our Clearing capabilities, as well as our coverage of financial securities, such as equities and fixed income, in Agency and Execution. Furthermore, our acquisition of the brokerage business of OTCex in February 2023 also expanded our capabilities in financial securities, particularly increasing our distribution in equities and fixed income in Europe and the Middle East. In the years ended December 31, 2023 and 2022, financial securities contributed revenue of $345.4 million and $100.2 million respectively, up from $63.4 million in the year ended December 31, 2021. However, we believe there are still meaningful growth opportunities within financial products in the United States, the Middle East and APAC.

### Pursue Strategic Acquisitions

While the majority of our growth in recent periods has been organic, acquisitions have also been an important driver and enhanced our capabilities. M&A has enabled us to enter new markets and provided access to new clients. We will continue to selectively consider financially attractive inorganic opportunities that enhance our strategic positioning and increase our scale.

We believe we have a track record of acquiring businesses at attractive valuations and successfully integrating them. For example, through the acquisition of ED&F Man Capital Markets, which was completed at a 0.8 times discount to book value, we increased our geographic exposure to the U.S. and APAC markets and added over 1,000 new clients. As a result, our client balances (including segregated and non-segregated client balances) increased by 83% to $14.6 billion as of December 31, 2022 from $8.0 billion as of June 30, 2022, and the acquisition added to our capabilities within the financial securities markets.

A core tenet of our M&A strategy has been to fully integrate acquisitions. We invest substantial time and resources post-closing to integrate and streamline technology and support infrastructures (including risk and compliance) of an acquired company. We also identify opportunities to cross-sell the expanded set of products and services to our clients. In doing so, we benefit from increased scale, higher operating margins as redundant costs are eliminated, deeper relationships with clients and higher client profitability.

Another key aspect has been strong discipline on valuation. We believe there is a significant opportunity to acquire competitors at attractive valuations, and therefore continued expansion through acquisitions remains a key focus as a means to further diversify by product, asset class and geography.

We have achieved high returns on acquired businesses historically as a function of our disciplined approach to valuation and our ability to grow client relationships of the acquired businesses. Due to cost synergies, these returns can be realized with our

Table of Contents

We believe the high degree of fragmentation in the global commodity broker market, characterized by increasing barriers to entry including higher operating, technology and regulatory compliance costs, provides an attractive backdrop for our business to make further strategic acquisitions.

The following summarizes our recent material M&A activity.

### CSC Commodities UK Limited

In January 2019, we acquired CSC for a $21 million premium (with "premium" defined as the purchase price paid over the total net asset value at acquisition). CSC is a London-based oil trading team specializing in on-exchange commodity derivatives, market making and trading oil-related derivatives across the barrel, from crude oil to fuel oil, distillates and light ends, alongside freight, natural gas and agricultural markets. Through the acquisition of CSC, we expanded our Market Making services into the energy sector and created additional value through cross-selling new products. Since we completed the acquisition, CSC has continued to operate under its existing brand name, and its entire infrastructure was integrated into our broader organization. CSC generated $33.4 million and $52.1 million in revenue and $6.7 million and $16.4 million in profit before tax, respectively, for the years ended December 31, 2023 and 2022.

### Rosenthal Collins Group LLC

In February 2019, we acquired the trade and assets of RCG for a $12 million premium. RCG was a regulated FCM based in Chicago, offering trade, execution, clearing, brokerage, managed futures and a range of electronic trading services. The RCG operates in a variety of commodities markets, including agriculture, currencies, energy, metals and stock indexes, and was subsequently consolidated within our existing U.S. FCM operations.

Through the acquisition of the RCG business, we enhanced our footprint in North America, expanded our Clearing business and augmented our product offering, particularly in our agriculture business. Further, this acquisition delivered value through cost synergies and continued investments delivering client asset growth. RCG generated $77.7 million and $58.5 million in revenue and $33.2 million and $11.8 million in profit before tax, respectively, for the years ended December 31, 2023 and 2022.

### Tangent Trading Ltd.

In March 2020, we acquired Tangent Trading, a London-based scrap metals trading firm. This acquisition enhanced the offerings of our global metals franchise and extended our strategy of developing our sustainable commodities business, which we think will be important in capturing the growth in environmentally sustainable products.

### X-Change Financial Access, LLC

In November 2020, we acquired XFA. XFA is a Chicago-based exchange traded derivatives execution broker specializing in benchmark global products, including S&P and VIX options, futures and futures options. Through the acquisition of XFA, we further enhanced our expansion into North America and expanded our Clearing business.

### ED&F Man Capital Markets

In August 2022, Marex and Marex Financial agreed to acquire the global businesses of ED&F Man Capital Markets for $233.6

million, which was a negative premium. Through the acquisition of ED&F Man Capital Markets, we expanded our client offering in the Clearing business, added to our metal franchise and enhanced our growing businesses in fixed income and equities. This acquisition added over 400 employees and over 1,000 new clients to our platform, as well as increased our

160

Table of Contents

capabilities in financial securities markets, including broker-dealer operations. For the year ended December 31, 2023, the acquired business generated $284.0 million in revenue compared with $274.8 million in the twelve months prior to acquisition (as prepared under U.S. generally accepted accounting principles prior to consolidation into our group).



\*    Pre-Acquisition figures represent the period from September 2021 to August 2022 and were prepared in accordance with U.S. GAAP.
1    Premium is the purchase price of the acquisition paid over the net asset value of the acquired business.

The acquisition also extended our geographic footprint in Dubai and APAC and helped to further solidify our franchise in the United States.

In the course of the acquisition, we identified several operational and financial synergies between our existing U.S. clearing and execution broker, MNA, and MCMI, the U.S. business of ED&F Man Capital Markets. These synergies led us to integrate the two businesses through the sale of MNA's assets, clients and employees to MCMI. This integration was effective as of July 15, 2023. Following the integration, on January 3, 2024, MNA was sold to a third-party purchaser. To date, we have recognized annualized cost synergies of approximately $15 million from this acquisition, which is based on the comparison of annualized costs of our Corporate segment for the first eight months of the year ended December 31, 2023 compared to the first eight months of the year ended December 31, 2022 (before the acquisition).

The acquisition involved staggered completions, with completion of the acquisitions of the U.K. business in October 2022, the Australian business in November 2022, the U.S. and Dubai businesses in December 2022 and the Hong Kong business in February 2023.

*OTCex/HPC*

In February 2023, we completed the acquisition of the brokerage business of OTCex. This involved the acquisition of HPC SA

Table of Contents

## 6  Segmental Analysis  (continued)

The Group's revenue and non-current assets by subsidiary company's country of domicile is as follows. In presenting geographical information, revenue is based on the geographic location of the legal entity where the customers' revenue is recorded. Non-current assets are based on the geographic location of the legal entity where the assets are recorded.

|  | Revenue | | | Non-current assets | |
|---|---|---|---|---|---|
|  | 2023 $m | 2022 $m | 2021 $m | 2023 $m | 2022 $m |
| United Kingdom | 607.2 | 414.4 | 361.5 | 234.7 | 194.5 |
| United States | 422.0 | 238.1 | 120.2 | 46.3 | 47.1 |
| Rest of the world | 215.4 | 58.6 | 59.8 | 12.0 | 7.0 |
| Total | 1,244.6 | 711.1 | 541.5 | 293.0 | 248.6 |

The balances in Rest of the world mainly consist of those from countries in Europe and the Asia-Pacific region, none of which are individually material for separate disclosure.

Non-current assets for this purpose consist of goodwill, intangible assets, property, plant and equipment, right-of-use assets, investments, and investment in associate.

## 7  Interest income and expense

|  | 2023 $m | 2022 $m | 2021 $m |
|---|---|---|---|
| **Interest income** | | | |
| Financial institutions[1] | 242.0 | 106.1 | 13.1 |
| Exchanges[2] | 235.0 | 27.2 | — |
| Securities[3] | 97.5 | 51.0 | — |
| Clients[4] | 17.3 | 10.1 | 10.0 |
|  | 591.8 | 194.4 | 23.1 |
| **Interest expense** | | | |
| Clients[5] | (194.8) | (19.9) | (0.5) |
| Borrowings and debt issued[6] | (179.8) | (59.7) | (18.6) |
| Exchanges[7] | (26.1) | (28.9) | (6.4) |
| Securities[8] | (67.1) | (55.5) | — |
| Lease interest expense | (2.4) | (1.0) | (0.9) |
|  | (470.2) | (165.0) | (26.4) |
| **Net interest income/ (expense)** | 121.6 | 29.4 | (3.3) |

1. Interest income from financial institutions includes interest earned from banks from cash and cash equivalents on client money (see note 33) and the Group's own cash and cash equivalents.
2. Interest income from deposits placed at exchanges, clearing houses, and intermediary brokers placed at these counterparties to facilitate transactional activity. Interest income is calculated using a deposit rate linked to the benchmark interest rates.
3. Securities interest income arises from securities purchased under agreements to resell repurchase and stock borrowing activities.
4. Interest income from clients is the result of credit lines offered to clients.
5. Interest expense includes interest paid to clients on cash deposited with the Group by clients.
6. Interest expense from debt securities includes the interest component on structured notes and the coupons for the EMTN issuance Interest expense from EMTN notes was $33.4m (2022: $nil, 2021 $nil) and interest expense on structured notes is $142.2m (2022:$55.1m, 2021: $16.2m). Structured notes are

Table of Contents

**17    Business combinations  (continued)**

*(f) Acquisition of Arfinco SA  (continued)*
*Goodwill*

The goodwill recognised on acquisition related to expected growth and revenue synergies with the Group's existing offering in trade execution services for commodities futures and options and the valuation of Arfinco's workforce which cannot be separately recognised as an intangible asset.

*(g) Acquisition of the business and selected assets of ED&F Man Capital Markets Limited*

In August 2022, the Group signed a share and asset purchase agreement to acquire certain businesses of ED&F Man Capital Markets. Each acquisition was completed on different dates as approvals from competency regulatory bodies in different jurisdictions were obtained.

On 1 October 2022, the Group acquired the business clients (clearing, metals, FF&O and FX), certain staff and selected assets of ED&F Man Capital Markets Limited, which is a limited liability company incorporated in England and Wales. This acquisition qualified as a business combination under IFRS 3.

|  | 2022 $m |
|---|---|
| Cash consideration | 43.9 |
| **Total consideration** | 43.9 |
| **Fair value of identifiable net assets:** | |
| Tangible fixed assets | 0.3 |
| Right-of-use assets | 0.1 |
| Cash and cash equivalents | 149.9 |
| Trade and other receivables | 4.2 |
| Prepayments and accrued income | 3.9 |
| Other debtors | 8.4 |
| Margins with brokers, exchanges and clearing houses | 115.4 |
| Receivable secured on default funds | 60.0 |
| Lease liabilities | (0.1) |
| Margins due to brokers, exchanges and clearing houses | (2.5) |
| Trade and other payables | (283.6) |
| **Total fair value of identifiable assets and liabilities** | 56.0 |
| **Bargain purchase gain** | 12.1 |

*Trade and other receivables and margins with brokers, exchanges and clearing houses*

The fair value of the receivables approximates to their book value. The gross contractual amounts of trade receivables are $4.4m. The best estimate at the acquisition date of the contractual cash flows not expected to be collected is $0.2m. For Margins with brokers, exchanges and clearing houses, the best estimate at the acquisition date of the contractual cash flows the Group expects to receive back is the same as the gross contractual amount.

***Acquisition-related costs***

Acquisition-related costs amounted to $3.8m.

F-56

Table of Contents

**17   Business combinations  (continued)**

*(g) Acquisition of the business and selected assets of ED&F Man Capital Markets Limited  (continued)*
*Contribution to the Group's results*

The business and assets acquired from ED&F Man Capital Markets Limited contributed $33.1m revenue and $12.8m to the Group's results for the period between the date of acquisition and the reporting date. If the acquisition of the business and assets had been completed on the first day of the financial year, the Group's revenue for the year would have increased by $84.5m and Group profit would have increased by $3.4m.

*Bargain purchase gain*

A bargain purchase gain of $12.1m was recognised as a result of the acquisition. The transaction resulted in a gain due to the discount applied of $12.1m to the tangible net assets acquired and has been recognised within the Group's consolidated income statement. The transaction resulted in a gain due to the desire of the seller to exit the capital markets business segment and raise capital to meet financial obligations. The lack of other companies that could acquire the business allowed Marex to obtain an acquisition price that was at a material discount to the tangible net asset value of the acquired businesses.

*(h) Acquisition of ED&F Man Capital Markets Australia Pty Ltd*

On 11 November 2022, the Group acquired all of the issued share capital of ED&F Man Capital Markets Australia Pty Ltd (renamed Marex Australia Pty Ltd) for $1.4m. Marex Australia Pty Ltd is a limited liability company incorporated in Australia, and operates as a broker and executes commodity futures, financial futures and other fixed income securities transactions for the accounts of its customers on a give-up basis.

|  | 2022 $m |
|---|---|
| Cash consideration | 1.4 |
| **Total consideration** | 1.4 |
| **Fair value of identifiable net assets:** |  |
| Tangible fixed assets | 0.2 |
| Right-of-use assets | 0.3 |
| Cash and cash equivalents | 1.5 |
| Trade and other receivables | 0.5 |
| Trade and other payables | (0.8) |
| Lease liabilities | (0.3) |
| **Total fair value of identifiable assets and liabilities** | 1.4 |

*Receivables*

The fair value of the receivables approximates to their book value. The gross contractual amount of trade receivables is $0.5m. The best estimate at the acquisition date of contractual cash flows not expected to be collected is $10,000.

*Acquisition-related costs*

No acquisition-related costs were incurred to this acquisition given the size of the acquired entity.

F-57

Table of Contents

**17   Business combinations  (continued)**

*(h) Acquisition of ED&F Man Capital Markets Australia Pty Ltd  (continued)*
*Contribution to the Group's results*

Marex Australia Pty Ltd contributed $0.4m revenue and $(0.5)m of loss to the Group's results for the period between the date of acquisition and the reporting date. If the acquisition of Marex Australia Pty Ltd had been completed on the first day of the financial year, the Group's revenue for the year would have been $2.0m more and Group profit would have been $4.3m less.

*(i) Acquisition of ED&F Man Capital Markets Holdings Limited and ED&F Man Capital Markets US Holdings Inc*

On 1 December 2022, the Group acquired the entire share capital of ED&F Man Capital Markets US Holdings Inc. (renamed Marex US Holdings Inc) together with its subsidiaries. Marex US Holdings Inc. is a company incorporated in the United States. On 1 December 2022, the Group acquired the entire share capital of ED&F Man Capital Markets Holdings Limited (renamed Marex Holdings Limited) together with its subsidiaries. Marex Holdings Limited is a limited liability company incorporated in Bermuda. These entities were acquired for a consideration of $183.0m. The ED&F Man Capital Markets acquisition enhances Marex's client offering and capabilities to serve clients. The acquisition creates a leading franchise in the US.

|  | 2022<br>$m |
|---|---|
| Cash consideration | 183.0 |
| **Total consideration** | 183.0 |
| **Fair value of identifiable net assets:** |  |
| Tangible fixed assets | 6.4 |
| Right-of-use-assets | 15.1 |
| Intangible assets | 2.4 |
| Cash and cash equivalents | 44.7 |
| Trade receivables | 2,178.8 |
| Margins with brokers, exchanges and clearing houses | 3,341.4 |
| Investments | 7.9 |
| Prepayments and accrued income | 7.1 |
| Marketable securities | 702.3 |
| Derivative financial instruments | 15.4 |
| Securities purchased under agreements to resell | 8,420.7 |
| Other debtors | 86.0 |
| Deferred tax asset | 5.0 |
| Trade and other payables | (4,360.0) |
| Lease liabilities | (15.1) |
| External loans | (198.6) |
| Other creditors | (1,582.0) |
| Derivative financial instruments | (15.4) |
| Securities sold under agreements to repurchase | (8,420.8) |
| **Total fair value of identifiable assets and liabilities** | 241.3 |
| **Bargain purchase gain** | 58.3 |

Table of Contents

**17   Business combinations  (continued)**

***(i) Acquisition of ED&F Man Capital Markets Holdings Limited and ED&F Man Capital Markets US Holdings Inc (continued)***
***Trade receivables and margins with brokers, exchanges and clearing houses***

The fair value of the receivables approximates to their book value. The gross contractual amounts of trade receivables are $2,179.3m. The best estimate at the acquisition date of the contractual cash flows not expected to be collected is $0.5m. For Margins with brokers, exchanges and clearing houses, the best estimate at the acquisition date of the contractual cash flows the Group expects to receive back is the same as the gross contractual amount.

***Acquisition-related costs***

Acquisition-related costs amount to $2.4m.

***Contribution to the Group's results***

The acquired entities contributed $78.4m revenue and $3.0m to the Group's results for the period between the date of acquisition and the reporting date. If the acquisition had been completed on the first day of the financial year, the Group's revenue for the year would have increased by $505.6m and the Group's profit would have increased by $25.8m.

***Bargain purchase gain***

A bargain purchase gain of $58.3m was recognised as a result of the acquisitions. The transaction resulted in a gain due to the discount applied to the purchase, an adjustment required by IFRS 3; the gain has been recognised in the Group's consolidated income statement. The transaction resulted in a gain due to the desire of the seller to exit the capital markets business segment and raise capital to meet financial obligations. The lack of other companies that could acquire the business allowed Marex to obtain an acquisition price that was at a material discount to the tangible net asset value of the acquired businesses.

F-59